**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

**MARIA JOHNSON,**
    **Plaintiff,**

**v.**                           **Case No. _____**

**KAREN NUNEZ, and**
**THE KAREN D. AUER**
**REVOCABLE TRUST,**
    **Defendants.**

_____/

**COMPLAINT**

**FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**PRELIMINARY STATEMENT**

1.    Plaintiff, MARIA JOHNSON (hereinafter "Plaintiff"), brings this action to challenge unlawful housing discrimination under both the Federal Fair Housing and Florida Fair Housing Act against Defendants, KAREN NUNEZ and THE KAREN D. AUER REVOCABLE TRUST (hereinafter "Defendants").

2.    This is a two-count action for money damages, court costs, and attorneys fees, with two causes of action arising under both the Florida (FL Stat. 760.23) and Federal Fair Housing Act, 42 U.S.C. §§ 3601 – 3619 (hereinafter "FHA").

3.    This case arises from Defendants' refusal to rent a residential dwelling located at 2649 NW 57th Place, Gainesville, FL 32653 ("Rental Property") to Plaintiff based on her familial status. After Plaintiff and Defendant Nunez executed a written lease agreement, Defendants rescinded that agreement upon learning the full household

composition of Plaintiff's family and refused to execute the Housing Assistance Payment Contract (hereinafter "HAP Contract") from the Gainesville Housing Authority (hereinafter "GHA"). Defendants subsequently rented the same property to a couple without children.

4. Under federal, state law and local ordinance, housing providers are prohibited from making housing unavailable, or from discriminating in the terms and conditions of rental based on a prospective tenant's familial status. Defendants' conduct constitutes a knowing violation of the Federal Fair Housing Act, the Florida Fair Housing Act, and the Code of Ordinances for the City of Gainesville, Florida.

5. The City of Gainesville Office of Equity and Inclusion (hereinafter "OEI"), acting on behalf of the City of Gainesville Human Rights Board (hereinafter "Board"), conducted a comprehensive investigation and issued a Notice of Determination of Reasonable Cause. The investigation revealed that Defendants' engaged in discriminatory practices such that OEI Cause Determination found that Defendants' refusal to rent to the Plaintiff constituted a violation of the City of Gainesville's Anti-Discrimination Ordinance.

6. Plaintiff seeks declaratory relief, an injunction preventing Defendants from continuing discriminatory practices and actual damages for the emotional and financial harm suffered due to Defendants' violations. Plaintiff further seeks punitive damages to deter Defendants and other landlords from engaging in similar misconduct in the future, as well as related Attorneys' fees and costs.

**JURISDICTION**

2

7.    This Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (Federal Question) based on a claim under the Fair Housing Act 42 U.S.C. § 3613 (Fair Housing).

8.    This Court also has supplemental jurisdiction under 28 U.S.C. § 1367, over Plaintiffs' claims under the Florida Fair Housing Act, §760.20, *et. seq.*

## VENUE

9.    Venue is proper in the United States District Court, Northern District of Florida, Gainesville Division, pursuant to 28 U.S.C. § 1391(b)(2) and Northern District Local Rule 3.1., because a substantial portion of the events giving rise to this action occurred in Alachua County, Florida and the Rental Property is located within the District.

## PARTIES

10.   Plaintiff, MARIA JOHNSON, is an individual residing within Alachua County, Florida at 1300 NE 39th Avenue, Apt. 140, Gainesville, Florida 32609.

11.   Defendant, KAREN NUNEZ, f/k/a Karen D. Auer (hereinafter "Nunez") is an individual residing within Pasco County, Florida at 15413 Azra Drive, Odessa, Florida 33556.

12.   Defendant, THE KAREN D. AUER RECOVABLE TRUST (hereinafter the "Trust"), is a revocable trust created by Nunez with trust corpus real properties located in Alachua County, Florida.

13.   Nunez is the trustee for the Trust, with the Trust's mailing address sharing Nunez's address in Pasco County, Florida at 15413 Azra Drive, Odessa, Florida 33556.

3

14.    At all times relevant to this action, the Trust owns and Nunez holds beneficial interest in a parcel of real property and a single-family dwelling located thereon in Alachua County, Florida, the Rental Property, located at 2649 NW 57th Place, Gainesville, Florida 32653.

### FACTUAL ALLEGATION APPLICABLE TO BOTH COUNTS

15.    At all times relevant to this action, Nunez was a licensed real estate sales associate in the State of Florida carrying License Number SL3221138.

16.    As required by Florida law to maintain her license, Nunez regularly completed every two years at least 14 hours of continuing education to maintain her real estate sales associate license. Preceding 2024, Nunez received training on housing discrimination, including the protections afforded under the Fair Housing Act.

17.    At all times relevant to this action, Nunez and the Trust utilized the Rental Property as a residential dwelling unit rented to tenants for income and revenue beneficial to Nunez and the Trust. Commencing in or about November 2022, Nunez rented the Rental Property to residential tenants for a monthly rent of $1,800.00

18.    The Rental Property's single-family dwelling is approximately 1,170 square feet, with three bedrooms and 2 bathrooms (Exhibit of Photo of Property)

19.    At all times relevant to this action, Plaintiff was employed by the Gainesville Housing Authority and was ready, willing and able to rent the Rental Property.

20.    Plaintiff is the parent and legal custodian or four (4) minor children, all of whom had not attained the age of 18 years and were domiciled with Plaintiff. At all times

relevant to this action, Plaintiff was a person in the process of securing legal custody of an additional minor child, her nephew, who was also intended to be a member of her household.

21.     On or about June 12, 2024, following the conclusion of her prior tenants' rental agreement, Nunez once again listed the Rental Property for rent to prospective tenants on Zillow (Exhibit A - Zillow Posting)

22.     Between June 15, 2024 and June 27, 2024, GHA processed the initial tenancy approval for the Rental Property, including a rent reasonableness review and initial inspection. The GHA ultimately found that Plaintiff fell within the applicable payment standard for vouchers. (Exhibit B - Request for Tenancy Approval Packet)

23.     Two Housing Quality Standards inspections were conducted. The first inspection, conducted on or about June 20, 2024, resulted in a failure (Exhibit C - Housing Quality Standards Inspection Failure) . The second inspection, conducted on or about June 25, 2024, found the Rental Property in compliance with an expected tenant portion of $902.00 per month and housing assistance copayment of $898.00 to round out the rental payment of $1,800 (Exhibit D - Housing Quality Standards Inspection Passed and Exhibit E - Housing Assistance Invoice History)

24.     On or about June 25, 2024, Nunez prepared a lease agreement using the names listed in Plaintiff's Zillow application, without further contacting Plaintiff to clarify or confirm the full composition of her household. The lease was subsequently signed by both the Plaintiff and Nunez. Among its terms, the lease required payment of a security deposit, and first and last months' rent on July 31, 2024. (Exhibit F - Lease

Agreement)

25.     Plaintiff advised Nunez that, pursuant to the requirements of her Housing Choice Voucher and HAP Contract, she was prohibited from paying the last month's rent in advance, as doing so would violate the prior contractual obligations with the GHA.

26.     On or about June 27, 2024, Nunez received the HAP Contract from Sara Croissey, a representative from GHA. (Exhibit G - Housing Assistance Payments Contract). The HAP Contract expressly listed the household as consisting of two (2) adults and four (4) children. It further specified that the GHA would remit $898.00 directly to Nunez via direct deposit on July 1, 2024, and Plaintiff would be responsible for paying her individual portion of $902.00 per month. Nunes had every opportunity to review and understand the payment structure set forth in the HAP Contract.

27.     Plaintiff confirmed the household composition via text messages with Nunez (Exhibit H - Text Message Exchange Between Parties). Nunez expressed concern upon being apprised of the familial composition of Plaintiff's household and stated that she "needed to think it over" (Exhibit I - Email exchange from Respondent dated June 28, 2024)

28.     On or about June 28, 2024, the housing assistance contract was transmitted to the Defendant. Upon receipt the Defendant communicated to the housing authority caseworker that she needed to "think about" the household composition before singing. The Plaintiff then reached out directly via phone call to inquire about the status of the contract. During the phone call, Defendant stated words to the effect of: "I'm not signing that signing will all those kids in the household," and further stated that this arrangement

6

was "not what we agreed upon" and "not what was on your Zillow application." Plaintiff reminded the Defendant that she had previously spoken by phone with each of Complainant's children prior to the issuance of the housing assistance contract, and was therefore fully aware of the household composition at the time she agreed to lease the unit. Defendant concluded the phone call by stating that the tenancy was "starting off the wrong way," that she wished to "keep it that way," and that she would "pray about it."

29.     On or about June 28, 2024, Nunez sent Plaintiff an email stating "I have talked with my husband and prayed about the 'misunderstanding' that we seem to keep having. I don't need any help rationalizing, making decisions, or telling me what I heard. I think it is best that we end this here. I have a good relationship with all of my tenants and would like to keep it that way. I wish you and your family all the luck." (Id.)  By this email, Nunez formally rejected the HAP Contract and rescinded the lease agreement that had been signed and executed by both parties.

30.     Notably, prior to the email rescinding the lease, Nunez had affirmatively accommodated the delayed security deposit by amending the lease agreement to extend the security deposit due date to July 31, 2024, memorializing the accommodation in a written amended rental agreement signed by Nunez on or about June 27, 2024 (Exhibit F - Lease Agreement). Nunez's owned signed documentation confirms she was aware of this and had agreed to the delayed deposit. Further, the HAP Contract, which Nunez received on or about June 27, 2024, expressly provided that the GHA would remit $898.00 directly to Nunez via direct deposit on July 1, 2024.

31.     On or about July 24, 2024, Nunez rented the Rental Property to Carter

Bauer and Rachael Nelson, an unmarried couple without children.

### *Analysis and Determination Findings of the City of of Gainesville*
### *Office of Equity and Inclusion*

32.    On or about September 6, 2024 Plaintiff filed a complaint (Exhibit J Complaint of Discrimination Completed September 6, 2024) alleging unlawful housing discrimination with the City of Gainesville Office of Equity and Inclusion. On or about September 9, 2024, OEI opened a file and provided notice to the Plaintiff that the investigation would proceed. The Complaint would proceed under the investigation of OEI as EO-E-2024-14.(Exhibit K - Notice of Receipt from the Office of Equity and Inclusion from the City of Gainesville)

33.    During the Investigation both parties were given the opportunity to put forward their Position Statement regarding the discrimination. (Exhibit L - Respondent's Position Statement and Exhibit M - Complaint's Rebuttal to Position Statement)

34.    On or about December 4, OEI completed its Investigative Report (Exhibit N - Investigative Report). On or about February 13, 2025 OEI signed off on the Investigative Report and submitted the matter to the Board.

35.    The OEI Investigative Report established through a comprehensive Review of the evidence a clear pattern of discriminatory conduct directed at the Plaintiff on the basis of her familial status. The Board concluded that each prima facie element of a familial status discrimination complaint was satisfied: (1) The Plaintiff is a member of a protected class as a mother with minor children; (2) Plaintiff inquired about and applied for the Rental Property; (3) Nunez, with knowledge of Plaintiff's familial status on two

separate and distinct occasions (First at the open house on or about June 15, 20254 and second upon receiving the HAP contract on or about June 27, 2024) refused to rent the Rental Property to the Plaintiff ; and (4) Nunez subsequently rented the Rental Property to a couple without children, establishing her willingness to rent to persons outside Plaintiff's protected class.

36. On or about February 24, 2025, the Board convened to discuss Plaintiff's complaint and adopted the findings of the OEI Investigative Report, concluding that discrimination based on familial status was the "but-for" cause for Nunez's refusal to rent. That same day, the Board issued a Notice of Determination of Reasonable Cause finding the Nunez violated the City's of Gainesville's Anti Discrimination Ordinance, on the basis of Familial Status (Exhibit O - Notice of Determination of Reasonable Cause).

37. On or about March 5, 2025, Plaintiff elected to file a civil action and administrative case before the Board was closed (Exhibit P - Election to begin Civil Action).

## CLAIMS FOR RELIEF

### COUNT I
### FAIR HOUSING ACT VIOLATIONS DUE TO FAMILIAL STATUS
### *42 U.S.C. § 3604(a)*

38. Plaintiff incorporates by reference Paragraphs 1 through 35 as if fully forth herein.

39. This is a cause of action for actual damages, punitive damages, court costs, and attorneys fees pursuant to the FHA, 42 U.S.C. § 3613(c).

40. The FHA defines "familial status" as one or more individuals (who have

9

not attained the age of 18 years) being domiciled with a parent or another person having legal custody of such individual or individuals; or the designee of such parent or other person having such custody, with the written permission of such parent or other person. (42 U.S.C. § 3602(k)). The protections afforded against discrimination on the basis of familial status shall apply to any person who . . . is in the process of securing legal custody of any individual who has not attained the age of 18 years

41.     At all times relevant to this action, Plaintiff is the parent and legal custodian of four minor children who have not attained the age of 18 years and who are domiciled with Plaintiff. Plaintiff also sought to secure legal custody of her minor nephew, who was intended to reside in the household. Plaintiff therefore qualifies as a member of the protected class of persons with "familial status" within the meaning of 42 U.S.C. § 3602(k).

42.     The FHA makes it unlawful to "otherwise make unavailable or deny a dwelling to any person because of . . . familial status . . .." 42 U.S.C. § 3604(a).

43.     Defendants had actual knowledge of Plaintiff's familial status. Plaintiff disclosed her family composition (including her four minor children) directly to Nunez at the open house on or about June 15, 2024. Defendants were again placed on explicit notice of Plaintiff's familial status and household size upon Nunez's receipt of the HAP Contract on or about June 27, 2024, which expressly listed two adults and four children as occupants.

44.     Defendants' decision to rescind the fully executed lease agreement and

refuse to execute the HAP Contract was made only after Nunez received the HAP Contract confirming the full familial composition of Plaintiff's household. This rescission made the Rental Property unavailable to Plaintiff because of her familial status which is in violation of 42 U.S.C. § 3604(a) .

45.    Following her refusal to rent to the Plaintiff, Nunez rented the Rental Property on or about July 24, 2024, to Carter Bauer and Rachael Nelson, an unmarried couple without children. This establishes that the Rental Property remained available and that Nunez was in fact willing to negotiate and execute a rental agreement with individuals outside of the Plaintiff's protected class.

46.    Nunez is a licensed real estate sales associate who, as required by Florida Law, received regular training in fair housing protections, including the prohibitions on familial status discrimination. Nunez's decision to rescind the executed lease refused to execute the HAP Contract upon learning the full composition of the Plaintiff's household constitutes willful and knowing discrimination in reckless disregard of Plaintiff's federally protected fair housing rights.

47.    As a direct and Proximate Results of Defendants' unlawful discriminatory conduct, Plaintiff suffered actual damages from the actions and omissions of Defendants, including but not limited to the costs associated with loss of secured housing, economic harm over a period of approximately eight months including an increase in rent and the loss of Plaintiff's Housing Choice Voucher benefits, relocation and moving costs, increased transportation costs, and collateral burden of a failed relocation that would not have occurred but for Defendants' discriminatory conduct. Plaintiff also suffered

significant and ongoing emotional distress, including familial disruption, shame, humiliation, and mental anguish, from her inability for her nephew to join the household as intended and is entitled to recovery of those actual damages pursuant to 42 U.S.C. § 3613(c).

48.    Johnson is also entitled to punitive damages in an amount to be determined by the trier of fact pursuant to 42 U.S.C. § 3613(c). Given the Defendants' discriminatory conduct was willful, intentional, and carried out with knowledge that their actions violated the Fair Housing Act. The recission of a fully executed lease agreement immediately upon learning the full familial composition of Plaintiff's household demonstrates a degree of reprehensible behavior as to warranting punitive damages.

**COUNT II**
**FAIR HOUSING ACT VIOLATIONS BECAUSE OF FAMILIAL STATUS IN THE TERMS, CONDITIONS AND PRIVILEGES OF RENTAL**
*42 U.S.C. § 3604(b)*

49.    Plaintiff incorporates by reference Paragraphs 1 through 35 as if fully forth herein.

50.    This is a cause of action for actual damages, punitive damages, court costs, and attorneys fees pursuant to the FHA, 42 U.S.C. § 3613(c)

51.    The FHA also prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of . . . familial status . . .." 42 U.S.C. § 3604(b).

52.    As set forth above, Defendants had actual knowledge of Plaintiff's Familial

12

Status on two separate occasions during the rental process. Despite executing a written lease agreement, Defendants imposed conditions and terms on the Plaintiff that were not applied to prospective tenants outside her protected class, rescinded the executed lease and refused to execute the HAP Contract upon confirmation of Plaintiff's household composition.

53.    Defendants failed to offer Plaintiff the same terms and conditions for renting as those provided to other applicants, such as Carter Bauer and Racheal Nelson. Defendants provided more favorable terms and were more accommodating to these individuals, such that they executed a lease agreement with them. Mr. Bauer and Ms. Nelson did not have minor children and thus were not subject to the same scrutiny applied to the Plaintiff by the Defendants.

54.    Defendants' conduct in rescinding the executed lease agreement and refusal to execute the HAP Contract based on the familial composition of Plaintiff's household constitutes unlawful discrimination in the terms, conditions, and privileges of the rental dwelling in violation of 42 U.S.C. § 3604(b).

55.    As a direct and Proximate Results of Defendants' unlawful discriminatory conduct, Plaintiff suffered actual damages from the actions and omissions of Defendants, including but not limited to the costs associated with loss of secured housing, economic harm over a period of approximately eight months including an increase in rent and the loss of Plaintiff's Housing Choice Voucher benefits, relocation and moving costs, increased transportation costs, and collateral burden of a failed relocation that would not have occurred but for Defendants' discriminatory conduct. Plaintiff also suffered

significant and ongoing emotional distress, including familial disruption, shame, humiliation, and mental anguish, from her inability for her nephew to join the household as intended and is entitled to recovery of those actual damages pursuant to 42 U.S.C. § 3613(c).

56.    Johnson is also entitled to punitive damages in an amount to be determined by the trier of fact pursuant to 42 U.S.C. § 3613(c). Given the Defendants' discriminatory conduct was willful, intentional, and carried out with knowledge that their actions violated the Fair Housing Act. The recession of a fully executed lease agreement immediately upon learning the full familial composition of Plaintiff's household demonstrates a degree of reprehensible behavior as to warranting punitive damages.

### COUNT III
### FLORIDA FAIR HOUSING ACT VIOLATIONS DUE TO FAMILIAL STATUS
*Fla. Stat. §760.23(1)*

57.    Plaintiff incorporates by reference Paragraphs 1 through 35 as if fully forth herein.

58.    This is a cause of action for actual damages, punitive damages, court costs, and attorneys fees pursuant to the Florida Fair Housing Act ("FFHA"), Fla. Stat. §760.35(1).

59.    The FFHA  defines "familial status" as one or more individuals (who have not attained the age of 18 years) being domiciled with a parent or other person having legal custody of such individual or individuals; or a designee of such parent or other person having legal custody, with the written permission of such parent or other person. ( Fla. Stat. §760.22(5)). Furthermore the FFHA affords these protections against

14

discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years. (Fla. Stat. §760.23(6))

60.    At all times relevant to this action, Plaintiff is the parent and legal custodian of four minor children who have not attained the age of 18 years and who are domiciled with Plaintiff. Plaintiff also sought to secure legal custody of her minor nephew, who was intended to reside in the household. Plaintiff therefore qualifies as a member of the protected class of persons with "familial status" within the meaning of Fla. Stat. §760.22(5)

61.    The FFHA makes it unlawful to "otherwise make unavailable or deny a dwelling to any person because of . . . familial status . . .." Fla. Stat. §760.23(1).

62.    Defendants had actual knowledge of Plaintiff's familial status. Plaintiff disclosed her family composition (including her four minor children) directly to Nunez at the open house on or about June 15, 2024. Defendants were again placed on explicit notice of Plaintiff's familial status and household size upon Nunez's receipt of the HAP Contract on or about June 27, 2024, which expressly listed two adults and four children as occupants.

63.    Defendants' decision to rescind the fully executed lease agreement and refuse to execute the HAP Contract was made only after Nunez received the HAP Contract confirming the full familial composition of Plaintiff's household. This rescission made the Rental Property unavailable to Plaintiff because of her familial status which is

in violation of Fla. Stat. §760.23(1).

64.    Following her refusal to rent to the Plaintiff, Nunez rented the Rental Property on or about July 24, 2024, to Carter Bauer and Rachael Nelson, an unmarried couple without children. This establishes that the Rental Property remained available and that Nunez was in fact willing to negotiate and execute a rental agreement with individuals outside of the Plaintiff's protected class.

65.    Nunez is a licensed real estate sales associate who, as required by Florida Law, received regular training in fair housing protections, including the prohibitions on familial status discrimination. Nunez's decision to rescind the executed lease refused to execute the HAP Contract upon learning the full composition of the Plaintiff's household constitutes willful and knowing discrimination in reckless disregard of Plaintiff's federally protected fair housing rights.

66.    As a direct and Proximate Results of Defendants' unlawful discriminatory conduct, Plaintiff suffered actual damages from the actions and omissions of Defendants, including but not limited to the costs associated with loss of secured housing, economic harm over a period of approximately eight months including an increase in rent and the loss of Plaintiff's Housing Choice Voucher benefits, relocation and moving costs, increased transportation costs, and collateral burden of a failed relocation that would not have occurred but for Defendants' discriminatory conduct. Plaintiff also suffered significant and ongoing emotional distress, including familial disruption, shame, humiliation, and mental anguish, from her inability for her nephew to join the household as intended and is entitled to recovery of those actual damages pursuant Fla. Stat.

16

§760.35(1).

67.     Johnson is also entitled to punitive damages in an amount to be determined by the trier of fact pursuant to Fla. Stat. §760.35(1). Given the Defendants' discriminatory conduct was willful, intentional, and carried out with knowledge that their actions violated the Fair Housing Act. The rescission of a fully executed lease agreement immediately upon learning the full familial composition of Plaintiff's household demonstrates a degree of reprehensible behavior as to warranting punitive damages.

**COUNT IV**
**FLORIDA FAIR HOUSING ACT VIOLATIONS BECAUSE OF FAMILIAL STATUS IN THE TERMS, CONDITIONS AND PRIVILEGES OF RENTAL**
***Fla. Stat. §760.23(2)***

68.     Plaintiff incorporates by reference Paragraphs 1 through 35 as if fully forth herein.

69.     This is a cause of action for actual damages, punitive damages, court costs, and attorneys fees pursuant to the FFHA, Fla. Stat. §760.35(1).

70.     The FFHA also prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of . . . familial status . . .." Fla. Stat. §760.23(2).

71.     As set forth above, Defendants had actual knowledge of Plaintiff's Familial Status on two separate occasions during the rental process. Despite executing a written lease agreement, Defendants imposed conditions and terms on the Plaintiff that were not applied to prospective tenants outside her protected class, rescinded the executed lease

and refused to execute the HAP Contract upon confirmation of Plaintiff's household composition.

72.    Defendants failed to offer Plaintiff the same terms and conditions for renting as those provided to other applicants, such as Carter Bauer and Racheal Nelson. Defendants provided more favorable terms and were more accommodating to these individuals, such that they executed a lease agreement with them. Mr. Bauer and Ms. Nelson did not have minor children and thus were not subject to the same scrutiny applied to the Plaintiff by the Defendants.

73.    Defendants' conduct in rescinding the executed lease agreement and refusal to execute the HAP Contract based on the familial composition of Plaintiff's household constitutes unlawful discrimination in the terms, conditions, and privileges of the rental dwelling in violation of Fla. Stat. §760.23(2).

74.    As a direct and Proximate Results of Defendants' unlawful discriminatory conduct, Plaintiff suffered actual damages from the actions and omissions of Defendants, including but not limited to the costs associated with loss of secured housing, economic harm over a period of approximately eight months including an increase in rent and the loss of Plaintiff's Housing Choice Voucher benefits, relocation and moving costs, increased transportation costs, and collateral burden of a failed relocation that would not have occurred but for Defendants' discriminatory conduct. Plaintiff also suffered significant and ongoing emotional distress, including familial disruption, shame, humiliation, and mental anguish, from her inability for her nephew to join the household as intended and is entitled to recovery of those actual damages pursuant to Fla. Stat.

§760.35(1).

75.    Johnson is also entitled to punitive damages in an amount to be determined by the trier of fact pursuant to Fla. Stat. §760.35(1). Given the Defendants' discriminatory conduct was willful, intentional, and carried out with knowledge that their actions violated the Florida Fair Housing Act. The recession of a fully executed lease agreement immediately upon learning the full familial composition of Plaintiff's household demonstrates a degree of reprehensible behavior as to warranting punitive damages.

## ATTORNEYS FEES AND COSTS (ALL COUNTS)

76.    Plaintiff has incurred or will incur costs in the prosecution of this civil action and is entitled to recovery of the same. Further, Plaintiff retained the undersigned attorneys to protect her rights and interest herein, and the undersigned attorneys may be entitled to the recovery of reasonable attorneys fees and costs pursuant to applicable law (42 U.S.C. § 3613(c). Plaintiff assigned to the undersigned attorneys all entitlement to the recovery of attorneys fees herein and entitlement to any costs advanced on her behalf.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, MARIA JOHNSON, respectfully requests that this Court:

A.      Enter final judgment in favor of Johnson and against Defendants;

B.      Award to Plaintiff all damages permitted by law against Defendants including actual damages and punitive damages from Defendants

C.      Award Johnson reasonable attorneys fees and court costs from Defendants, and enter an appropriate judgment; and

D.      Grant such other relief that the Court deems necessary or appropriate.

DEMAND FOR JURY TRIAL

## JURY DEMAND

Plaintiff hereby demands a trial by Jury.

**RESPECTFULLY FILED**, this Second day of June, 2026.

**FLORIDA LEGAL SERVICES, INC.**
**Attorneys for Plaintiff**

By: /s/ Pablo Hereter
    Pablo Hereter
    Florida Bar No. 1054509
    Florida Legal Services
    PO Box 533986
    Orlando, FL 32853
    Phone: (407) 801-4253
    Facsimile: (407)505-7327
    Email: pablo.hereter@floridalegal.org

By: /s/ Joseph E. Cordova
    Joseph Cordova
    Florida Bar No. 1011275
    Florida Legal Services
    PO Box 533986
    Orlando, FL 32853
    Phone: (407) 801-4224
    Email: joseph.cordova@floridalegal.org

# EXHIBIT A





# EXHIBIT B

PRINT TENANT NAME: _Maria Johnson_

GHA Internal Use: Date Received _____



**GAINESVILLE HOUSING AUTHORITY**
*Where Housing Matters*

1900 SE. 4ᵗʰ St., Gainesville, FL 32641
Phone (352) 872-5500 ~ Fax (352) 872-5501
www.gainesvillehousingauthority.org

EXECUTIVE DIRECTOR
PAMELA E. DAVIS

# REQUEST FOR TENANCY APPROVAL (RFTA)

This RFTA packet contains the following documents:

1. Landlord Information
2. Required Documentation Checklist
3. Housing Choice Voucher Landlord Certification
4. Request for Tenancy Approval required the landlord and tenant signature on page 2
5. Rent Reasonableness Assessment Data Sheet
6. HQS Inspection Checklist for Landlords & Tenants
7. W-9: Request for Taxpayer Identification Number and Certification
8. Release of Owner/Co-Owner Liability Form
9. Authorization Agreement for Direct Deposit
10. EPA HUD Fact Sheet
11. Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards also requires the landlord and tenant's signature.
12. Tenancy Addendum

**NOTE:** Forms that are incomplete or a RFTA packet missing required documentation, will be returned and cause a delay in the process. Please fill out, sign, and return all forms in this packet, along with required documentation.

## GHA is...

*Committed to advocating and providing affordable housing for eligible individuals and families.*

According to the Americans with Disabilities Act (ADA), we need your assistance in ensuring that all our programs, services, and activities are fully accessible to persons with disabilities. If you are a person with disabilities, and you require a specific accommodation in order to fully utilize our programs and services, please contact Gainesville Housing Authority at 352-872-5500.

# LANDLORD INFORMATION

## HOUSING CHOICE VOUCHER PROGRAM

## Gainesville Housing Authority

1900 SE 4th Street, Gainesville, FL 32641

Phone: 352-872-5500 • Fax: 352-872-5501

**What is the Housing Choice Voucher (HCV) Program?**
The HCV Program provides rental assistance for low-to-moderate income families in the private market. Rental voucher holders select a unit from the private rental market. Rental assistance makes market rate housing affordable. Program participants normally pay no more than 40% of monthly adjusted gross income towards rent and utilities. The housing assistance payment subsidizes the balance of the rent to the property owner, called HAP.

**What are the requirements for my unit to be rented to an assisted family?**
The unit must meet U.S. Department of Housing and Urban Development (HUD) Housing Quality Standards (HQS), and the rent must be approvable within HUD Fair Market Rents and local market rents when compared to unassisted comparable units.

**How do I make a unit available to voucher holders?**
Affordablehousing.com, an HCV program rental listing service to landlords and tenants, which allow property owners to list their vacant properties via internet.

**What do I do when a voucher holder is interested in my unit?**

### Tenant Screening

While GHA is required to obtain a criminal background report on all applicants, we are only responsible to determine if a family is "income" eligible to receive housing assistance. Landlords are encouraged to screen the prospective tenant carefully to ensure you are making a good selection. When one of our families contacts you, we can only certify to you their income eligibility for the program.

We cannot provide a reference as to their expected behavior as tenants. You may use any or all of the following screening procedures:

- Credit Check
- Criminal Background Check
- Landlord References
- Home Visits

We encourage all of the above screening methods as long as you do not discriminate. In Alachua County, rights of individuals are protected against discrimination based on race, color, national origin, religion, sex, marital status, age, disability, sexual orientation, gender identity or expression, familial status, citizenship status, lawful source of income, veteran or service member status, or being a victim of dating/domestic violence or stalking. You must not discriminate in the rental or occupancy of real estate on the basis of any of these protected classes.

### Request for Tenancy Approval (RFTA)

When you have selected a tenant, he/she will have a *"Request for Tenancy Approval"* (RFTA) form for you to complete. Upon submission of the RFTA, landlords are *required* to provide the following documents:

- Proof of ownership for the proposed rental property;
- W-9, with your social security or federal tax ID number and exact name on file with the IRS. Initial HAP payment will not be released without this information.
- Banking information for direct deposit.

Within 15 days of the submission of a **complete** RFTA, the Housing Inspector will contact landlord to schedule a Housing Quality Standard (HQS) Inspection. **NOTE: The submission of the RFTA indicates that the unit is ready for inspection and in "move-in" condition.**

## Housing Quality Standards (HQS) Inspection

All units that GHA subsidizes MUST pass HUD HQS inspections before the start of a HAP Contract and on a biennial basis. If the unit fails the initial inspection, the family will be advised to locate another unit (for new leases), unless arrangements are made to bring the unit in compliance with HQS. In the case of **BIENNIAL INSPECTIONS**, landlords and tenants are provided with written notification if the unit has failed inspection and will be given reasonable time (up to 30 days for non-emergency items and 24 hours for emergency items) to make the necessary repairs prior to the re-inspection date. If the unit fails the re-inspection, then the abatement of the Housing Assistance Payment (HAP) will begin on the first of the month following the failure to comply. **NOTE: HAPs are not retroactive for the period of abatement.**

## Rent Reasonableness

GHA staff determines rent reasonableness for the unit. As mandated by HUD, an assisted tenant may not pay more than an unassisted tenant would pay for the same or a similar unit. Staff also uses HUD's formula to calculate whether or not the tenant can "afford" the unit. If the proposed contract rent is too high for a particular tenant, the owner may be asked if they will accept a lower, rent amount. If the contract rent is agreed upon by both GHA and the owner, then the unit will be listed for inspection. **NOTE: The owner is not obligated to agree to a lower rent and may choose not to lease to a tenant who cannot afford their asking price.** If the unit is deemed rent reasonable and affordable to the tenant, then the landlord will be informed of the date when the keys should be given to the tenant. That date should be the tenant's move in date for the Lease Agreement and HAP Contract.

**NOTE: If the tenant moves in prior to approval by GHA, then the tenant is responsible for the entire rental amount.**

## Security Deposit

Landlords are encouraged to collect reasonable security deposits from tenants; however, the security deposit amount collected shall not exceed the amount collected from unassisted tenants. **NOTE: It is the responsibility of the landlord to collect the security deposit as required under state and local law. GHA will not subsidize any portion of the security deposit.**

## Lease Agreement

After the unit passes inspection and the rent has been approved, the landlord and tenant enter into a Lease Agreement for the initial term of one year. HUD regulations state the owner may use a standard form of Lease that they use for their unassisted tenants. In addition, federal regulations require the HUD Tenancy Addendum be made part of the Lease Agreement.

## Housing Assistance Payment Contract (HAP)

The Housing Authority and the landlord sign a Housing Assistance Payment (HAP) Contract through which the rent is subsidized on behalf of the tenant. The initial term of the HAP Contract is one year. After the initial term, the tenant may vacate the unit after providing sufficient notice (at least 60 days) in writing to the landlord. The owner may also terminate the lease/contract after the initial term and is required to provide a 60-day notice to the tenant, with a copy to the Housing Authority. If the tenant remains in the unit, the tenant is recertified for continued eligibility, which is approximately 90 days prior to the renewal date.

## Housing Assistance Payments (HAP)

HAP is issued to owners between the first and fifth day of each month. GHA has a mandatory direct deposit of all housing assistance payment. An Automatic Agreement for Direct Deposit is attached for your convenience. Pro-rated portions of HAP, that is, rental subsidy for initial lease dates beginning after the first day of any month, will be included with the HAP for the following month.

## What are my rights and responsibilities as a landlord?

- Maintain your property in good condition. Complete repairs within a reasonable amount of time upon request by the Housing Authority or tenant. The amount of time that is considered reasonable depends on the nature of the problem.
- Set reasonable rules about use of unit and common areas.
- Do not enter a unit without tenant permission and property notice, except for emergencies or tenant requested repairs.
- Collect appropriate security deposit as directed under the program and use it only as directed by State law.
- Comply with equal opportunity requirements:
  - **Reasonable Modification to Existing Premises (24 CFR 100.203)** – Under the Fair Housing Act, it is unlawful for an owner to refuse to permit a person with a disability, at their own expense, to make reasonable modification that may be necessary to afford the person with a disability full enjoyment of the premises. Under certain circumstances, the owner may require the tenant to pay into an escrow account funds necessary to restore the interior of the unit back to its original condition if the modification would interfere with the owner or next resident's full enjoyment of the premises. In addition, an owner may require that a resident restore modifications to the interior of the unit. Owners may refer to the regulation for further requirements and guidance.
  - **Reasonable Accommodation (24 CFR 100.204)** – The Fair Housing Act makes it unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities equal opportunities to use and enjoy a dwelling unit, including public and common use areas. Owners may refer to the regulation for further requirements and guidance.

- Enforce tenant obligations as according to the Lease, by providing proper notice in a timely manner.
- Take action through the Clerk of Court to evict when tenant violates the lease.
- Provide GHA with eviction notice.

## Expect your tenant to:
- Comply with the terms and condition of the Lease Agreement and Tenancy Addendum
- Pay rent on time
- Keep unit clean
- Avoid illegal activity
- Permit access for repairs
- Avoid damage to property
- Refrain from disturbing others
- Allow only those occupants on the lease to reside in the unit.
- Provide

## Miscellaneous Information

Under current HUD regulations, the tenant is **NOT ALLOWED** to lease from the following family members: parents, child, grandchild, grandparent, sister or brother of any family member of the tenant family, with exception to meet a disabled person's needs.



**GAINESVILLE HOUSING AUTHORITY**
*Where Housing Matters*

1900 SE. 4ᵗʰ St., Gainesville, FL 32641
Phone (352) 872-5500 – Fax (352) 872-5501
www.gainesvillehousingauthority.org

EXECUTIVE DIRECTOR
PAMELA E. DAVIS

## Request for Tenancy Approval
Housing Choice Voucher Program

U.S Department of Housing and
Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
exp. 04/30/2026

When the participant selects a unit, the owner of the unit completes this form to provide the PHA with information about the unit. The information is used to determine if the unit is eligible for rental assistance.

| 1. Name of Public Housing Agency (PHA) Gainesville Housing Authority 1900 SE 4th Street, Gainesville, FL 32641 | | | 2. Address of Unit (street address, unit #, city, state, zip code) 2649 NW 57th Place, Gainesville, fl 32608 | | |
|---|---|---|---|---|---|
| 3. Requested Lease Start Date 07/01/2024 | 4. Number of Bedrooms 3 | 5. Year Constructed 1975 | 6. Proposed Rent 1800.00 | 7. Security Deposit Amt 1000.00 | 8. Date Unit Available for Inspection 06/17/2024 |

**9. Structure Type**

☑ Single Family Detached (one family under one roof)

☐ Semi-Detached (duplex, attached on one side)

☐ Rowhouse/Townhouse (attached on two sides)

☐ Low-rise apartment building (4 stories or fewer)

☐ High-rise apartment building (5+ stories)

☐ Manufactured Home (mobile home)

**10. If this unit is subsidized, indicate type of subsidy:**

☐ Section 202   ☐ Section 221(d)(3)(BMIR)

☐ Tax Credit   ☐ HOME

☐ Section 236 (insured or uninsured)

☐ Section 515 Rural Development

☐ Other (Describe Other Subsidy, including any state or local subsidy) _____

**11. Utilities and Appliances**

The owner shall provide or pay for the utilities/appliances indicated below by an "O". The tenant shall provide or pay for the utilities/appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and provide the refrigerator and range/microwave.

| Item | Specify fuel type | Paid by |
|---|---|---|
| Heating | ☑ Natural gas ☐ Bottled gas ☐ Electric ☐ Heat Pump ☐ Oil ☐ Other | T |
| Cooking | ☐ Natural gas ☐ Bottled gas ☑ Electric ☐ Other | T |
| Water Heating | ☑ Natural gas ☐ Bottled gas ☐ Electric ☐ Oil ☐ Other | T |
| Other Electric | | T |
| Water | | T |
| Sewer | | T |
| Trash Collection | (Do not include dumpster fees). | O |
| Air Conditioning | (Indicate who pays to generate the A/C unit, via electricity). ---------------- | T |
| Other (specify) >>>> T | | Provided by |
| Refrigerator | | O |
| Range/Microwave | | O |

HUD 52517 (04/2023)

12. Owner's Certifications

a. The program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units. Owners of projects with more than 4 units must complete the following section for most recently leased comparable unassisted units within the premises.

| Address and unit number | Date Rented | Rental Amount |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

b. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving leasing of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

c. Check one of the following:

☐ Lead-based paint disclosure requirements do not apply because this property was built on or after January 1, 1978.

☐ The unit, common areas servicing the unit, and exterior painted surfaces associated with such unit or common areas have been found to be lead-based paint free by a lead-based paint inspector certified under the Federal certification program or under a federally accredited State certification program.

☑ A completed statement is attached containing disclosure of known information on lead-based paint and/or lead-based paint hazards in the unit, common areas or exterior painted surfaces, including a statement that the owner has provided the lead hazard information pamphlet to the family.

13. The PHA has not screened the family's behavior or suitability for tenancy. Such screening is the owner's responsibility.

14. The owner's lease must include word-for-word all provisions of the HUD tenancy addendum.

15. The PHA will arrange for inspection of the unit and will notify the owner and family if the unit is not approved.

OMB Burden Statement: The public reporting burden for this information collection is estimated to be 0.5 hours, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Collection of information about the unit features, owner name, and tenant name is voluntary. The information sets provides the PHA with information required to approve tenancy. Assurances of confidentiality are not provided under this collection. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions to reduce this burden, to the Office of Public and Indian Housing, US. Department of Housing and Urban Development, Washington, DC 20410. HUD may not conduct and sponsor, and a person is not required to respond to, a collection of information unless the collection displays a valid control number.

Privacy Notice: The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by 24 CFR 982.302. The form provides the PHA with information required to approve tenancy. The Personally Identifiable Information (PII) data collected on this form are not stored or retrieved within a system of record.

I/We, the undersigned, certify under penalty of perjury that the information provided above is true and correct. WARNING: Anyone who knowingly submits a false claim or makes a false statement is subject to criminal and/or civil penalties, including confinement for up to 5 years, fines, and civil and administrative penalties. (18 U.S.C. §§ 287, 1001, 1010, 1012; 31 U.S.C. §3729, 3802).

| Print or Type Name of Owner/Owner Representative | Print or Type Name of Household Head |
|---|---|
| Karen Nunez | Maria Johnson |
| Owner/Owner Representative Signature | Head of Household Signature |
| X _Karen Nunez_ | X _(signature)_ |
| Business Address | Present Address |
| 5658 SW 104th Terrace | 8851 W University Ave 71 Lake Butler, 32054 |
| Telephone Number | Date (mm/dd/yyyy) | Telephone Number | Date (mm/dd/yyyy) |
| 352-339-0634 | 06/17/2024 | 941.780.8894 | 6/17/24 |
| Email Address: karen.greentree@yahoo.com | Email Address: _____ |

HUD-52517 (04/2023)

# REQUIRED DOCUMENTATION

**Dear Owner/Agent:**

Upon submission of the Request for Tenancy Approval (RFTA) packet, you are required to provide the Gainesville Housing Authority (GHA) with photocopies of the following:

☑ PROOF OF OWNERSHIP (Provide one of the following):
- Warranty Deed
- Quick Claim Deed

☐ POWER OF ATTORNEY (POA)
- Required for any individual signing the HAP Contract and/or Lease that is not the same as the Owner(s) name appearing on the proof of ownership.

☐ MANAGEMENT AGREEMENT
- Required for all properties managed by a rental agency, agent, or other person other than the owners(s) listed on the proof of ownership.

☐ RELEASE OF CO-OWNER(S) LIABILITY
- Required for rental properties owned by multiple individuals or entities.

☐ TAXPAYER IDENTIFICATION
- U.S. Citizens and Resident Aliens: Provide a copy of your social security card
- Foreign Persons with Social Security or Tax ID #: Submit a W-8BEN (available at GHA office)
- Other Entities: Charter or other legal document creating the entity
- Copy may be faxed to GHA's office at 352-872-5500 upon submission of RFTA. Please include the tenant's name as reference.

☐ PICTURE IDENTIFICATION
- Required for the person responsible for signing the Housing Assistance Payment Contract (HAP).

☑ DIRECT DEPOSIT (MANDATORY)
- Authorization Agreement for Direct Deposits (ACH Credits) Form must be completed and submitted with an original voided check or deposit slip to confirm the routing and account numbers.

☐ HOMEOWNERS' ASSOCIATION
- Attach homeowner's association approval letter, if applicable

Lastly, in order to process this request in a timely manner, please return this entire RFTA packet with all required documentation to the GHA office.

# HOUSING CHOICE VOUCHER LANDLORD CERTIFICATION

RE: _____ 2649 NW 57th Place _____

Street Address of Unit

Gainesville _____ FL _____ 32653 _____

City                                State                                Zip

## OWNERSHIP OF ASSISTED UNIT

I certify that I am the legally designed agent for the above referenced unit, and that the prospective tenant has no ownership interest in this dwelling unit whatsoever. **I agree to notify GHA in writing prior to a change in the legal ownership of the unit and provide all information as requested by GHA.**

## APPROVED RESIDENTS OF ASSISTED UNIT

I understand that the family members listed on the Housing Assistance Payments (HAP) Contract are the only individuals permitted to reside in the unit. I also understand that I am not permitted to live in the unit while I am receiving housing assistance payments.

## HOUSING QUALITY STANDARDS

I understand my obligations in accordance and compliance with HAP Contract to perform necessary maintenance so the unit continues to comply with Housing Quality Standards (HQS).

## TENANT RENT PAYMENTS

I understand that the GHA determines the tenant's portion of the contract rent. Further, **I understand that it is illegal to charge any additional amounts for rent or any other item not specified in the lease which have been specifically approved by GHA.**

## REPORTING VACANCIES TO THE HOUSING AUTHORITY

I understand that should the assisted unit become vacant, I am responsible for notifying DBHA immediately in writing. I understand that overpayments to GHA must be returned within 30 days. If not, then GHA has my permission to reduce future HAP.

## COMPUTER MATCHING CONSENT

I understand the HAP Contract permits GHA or HUD to verify my compliance with the Contract. I consent for GHA or HUD to conduct computer matches to verify any compliance, as they deem necessary. GHA and HUD may release and/or exchange information regarding my participation in the HCV program with other Federal and State agencies.

## DRUG ACTIVITY

I certify that I have never been convicted of any drug related violent criminal activities.

## ADMINISTRATIVE AND CRIMINAL ACTIONS FOR INTENTIONAL VIOLATIONS

I understand that failure to comply with the terms and responsibilities of the HAP Contract are grounds for terminating the agreement. I understand that knowingly supplying false, incomplete, or inaccurate information is punishable under Federal or State criminal law.

Karen Nunez _____     *Karen Nunez* _____     06/17/2024 _____

Landlord/Agent (print name)                Signature                                Date

**WARNING:** Title 18, U.S. Code 1001, states that a person who knowingly and willingly makes false or fraud or fraudulent statements to any Department or Agency of the U.S. is guilty of a felony. State criminal law.

# RENT REASONABLENESS ASSESSMENT DATA SHEET

Gainesville Housing Authority (GHA) is required to assess whether the proposed rent for your unit is comparable to similar units within its local market. GHA's rent reasonableness assessment is based on the information you provide on this sheet. Your signature below certifies that the statements made on this form are true and correct. If the GHA Housing Inspector is unable to verify the information provided, GHA will need to re-assess the proposed rent and may need to request that it be lowered, which may delay the processing of your contract approval.

Tenant Name: Maria ~~Green~~ Johnson

Property Address: 2649 NW 57th Place                    Apt. #: _____

City, State, & Zip Code: Gainesville, FL  32608

Owner's Name(s): Karen Nunez                    Requested Rent: $ 1800.00

Property Management: myself

**Unit Information:** Bedroom(s): 3  Bathroom(s): 2  Square Footage: 1170  Year Built: 1975

**Property Type:** *(Check one)*

☑ Single Family ☐ Semi- Detached ☐ Manufactured Home ☐ Garden Walk Up ☐ Low Rise *(less than 4 floors)*

☐ High Rise *(4+ floors)* ☐ Duplex ☐ Triplex ☐ Quadplex ☐ Townhome/Villa ☐ Rowhouse ☐ Condo

**Upgrades:** ☐ Stainless Still Appliances ☐ Granite Countertops ☐ New Flooring ☐ Freshly Painted

**Quality/Condition:** ☐ Excellent ☑ Average ☐ Fair ☐ Poor

**Utility Types:**

Heating Fuel - ☐ Electric ☑ Natural/Bottle Gas ☐ Oil ☐ Propane -----> PAID BY: ☐ Owner ☑ Tenant

Cooking Fuel - ☑ Electric ☐ Natural/Bottle Gas ☐ Oil ☐ Propane -----> PAID BY: ☐ Owner ☑ Tenant

Hot Water - ☐ Electric ☑ Natural/Bottle Gas ☐ Oil ☐ Propane --------> PAID BY: ☐ Owner ☑ Tenant

Water - ☑ City ☐ Well Water --------------------------------> PAID BY: ☐ Owner ☑ Tenant

Sewer - ☑ Public Sewer ☐ Septic Tank --------------------> PAID BY: ☐ Owner ☑ Tenant

Cooling System - ☑ Central ☐ Window/Wall ☐ None

Heating System - ☑ Central ☐ Window/Wall ☐ None                    ✓

**Property Amenities:**

☐ Cable Included in Rent ☑ Ceiling Fans ☐ Dryer ☐ Washer ☑ W/D Hookups ☐ Onsite Laundry ☑ Dishwasher

☑ Garbage Disposal ☐ Microwave ☑ Refrigerator ☑ Stove ☐ Balcony ☐ Gated Community ☐ Pool

**Owner Pays For:** ☐ Electric ☐ Lawn Care ☐ Pest Control ☐ Lawn Care

Landlord Signature: *Karen Nunez*                    Date: 06/17/2024

Print Name: Karen Nunez                    Phone: 352-339-0634

> **W ARNING:** Title 18, US Code Section 1001, states that a person who knowingly and willingly makes false or fraudulent statements to any Department or Agency of the United States is guilty of a felony. State law may also provide penalties for false or fraudulent statements.

# HQS INSPECTION CHECKLIST FOR LANDLORDS & TENANTS

☐ Please inform the Housing Authority staff of any changes in telephone/contact information. It is imperative that the Housing Authority have valid contact information on file in the event that staff needs to contact you regarding schedule changes, etc.

☐ **BE ON TIME**. The Housing Inspector will wait no longer than 15 minutes past the scheduled appointment time.

☐ Utilities **MUST BE** on.

☐ No wires, cords, cables, etc. in traffic areas that may cause a trip hazard.

☐ No chipped, cracked, and/or peeling paint.

☐ Check all outlets and switches for **CRACKED OR MISSING** cover plates. Effective March 31, 2010, the U.S. Department of Housing and Urban Development (HUD) has issued a revision to 24 CFR 982.401 regarding electrical outlets. In accordance with this regulation), all 3-prong outlets **MUST BE** properly grounded. If the outlet is not properly grounded, the unit will *fail inspection*.

Please note the following:
1. 2-prong outlets are acceptable;
2. If there are 3-prong outlet(s) present with no proper ground, landlords may choose to replace the outlet(s) with a GFIC outlet, which is acceptable;
3. Landlords may choose to have an additional ground wire run to these outlets. To test outlets to ensure they comply with HQS regulations landlords may purchase a 3-prong outlet tester (usually sold for under $10.00). Plug the tester into the outlet(s) and follow the manufacturer's instructions for testing outlet(s). If a problem is detected, landlords may choose one of the options listed above to correct the deficiency.

☐ All debris must be removed from the interior and exterior of the home.

☐ Check windows for cracked/broken panes. In addition, window locks must be functional.

☐ Check plumbing for leaks (e.g. under sinks, toilets, tubs, etc.)

☐ **SMOKE DETECTORS MUST** be in working condition.

☐ Unit must be clean.

☐ Check for mold, especially in moist areas (bathrooms, under sinks, etc.). If mold is seen, it must be removed.

☐ All light fixture covers (both interior and exterior) must be in place.

☐ Replace all broken or burnt-out light bulbs.

This checklist is provided for information purposes and a guide only. It does not include all Housing Quality Standards set forth by HUD. For a complete guide, please refer to HUD's booklet *A Good Place to Live"* at https://portal.hud.gov/hudportal/documents/huddoc?id=DOC_11735.pdf.

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer**
**Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Karen Nunez

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC

☐ C Corporation ☐ S Corporation ☐ Partnership ☑ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

5658 SW 104th Terrace

**6** City, state, and ZIP code

Gainesville, FL  32608

Requester's name and address (optional)

**7** List account number(s) here (optional)

---

**Part I** | **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

2 6 3 – 4 5 – 6 9 2 4

or

Employer identification number

☐ ☐ – ☐ ☐ ☐ ☐ ☐ ☐ ☐

---

**Part II** | **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here** | Signature of U.S. person ▶ *Karen Nunez* | Date ▶ 06/17/2024

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)



**GAINESVILLE HOUSING AUTHORITY**
*Where Housing Matters*

Office Use Only:

Vendor # _____

## RELEASE OF OWNER / CO-OWNER LIABILITY

Date: _____ 06/17/2024

Property Address: _____ 2649 NW 57th Place _____

_____ Gainesville, FL 32653 _____

I, _____ Karen Nunez _____, am the owner / co-owner (circle one) of the
      *Name of Affiant*

above referenced property and fully understand that any and all Section 8 rent payments from The Gainesville Housing Authority will be made payable to the party listed below on my behalf:

_____ Karen Nunez _____
Name of Party      self
_____
Relationship to Affiant

5658 SW 104th Terrace _____

____ Gainesville, FL 32608 _____

____ karen.greentree@yahoo.com _____

Address, Phone Number, and E-mail of Party to receive HAP funds

BY: _____

IN WITNESS WHEREOF, I hereunto subscribe my name this _____ day of _____, 20_____.

Notary Printed Name: _____

Notary Signature: _____

My Commission expires: _____

Notary Seal:

Please E-mail, Mail, or Fax Completed Form to:
GAINESVILLE HOUSING AUTHORITY
1900 SE 4th Street, Gainesville, FL 32641
Telephone (352) 872-5500 ~ Fax (352) 872-5501
accounting@gnvha.org
www.gainesvillehousingauthority.org

Rev. 03/2013

# AUTHORIZATION FORM FOR DIRECT DEPOSIT

Name on Account _____ Karen D Auer TRT SSN or TIN ___ 263456924 ___

In Care of, or Doing Business As (if applicable)

_____

Financial Institution __PNC_____

Account Number____1222354677_____ Routing Number___267084199_____

Type of Account:    Checking  [✓]    Savings  [ ]

PLE YOUR VOIDED CHECK HERE
F DOCUMENTATION WILL BE ACCEPTED

Authorization:

I hereby authorize the Gainesville Housing Authority and the financial institution above to make direct deposits to my account. This authority will remain in effect until I have signed a new authorization or upon termination of participation.

_Karen Nunez_____          ___06/17/2024_____
Signature                                    Date

___Karen Nunez_____              ___352-339-0634____
Printed Name                                 Telephone Number

___karen.greentree@yahoo.com_____
Email Address (MANDATORY)

You may mail or email this completed form and voided check to:

| Gainesville Housing Authority 1900 S.E. 4th Street Gainesville, FL 32641 Attn: Angela Donley | Fax: 352-872-5517 Email: AngelaD@gnvha.org |
|---|---|

| United States Environmental Protection Agency | Prevention, Pesticides, and Toxic Substances (7404) | EPA-747-F-96-002 March 1996 (Revised 12/96) |



# **⊕EPA** Type text here
# **⊕HUD** FACT SHEET

# EPA and HUD Move to Protect Children from Lead-Based Paint Poisoning; Disclosure of Lead-Based Paint Hazards in Housing

## SUMMARY

The Environmental Protection Agency (EPA) and the Department of Housing and Urban Development (HUD) are announcing efforts to ensure that the public receives the information necessary to prevent lead poisoning in homes that may contain lead-based paint hazards. Beginning this fall, most home buyers and renters will receive known information on lead-based paint and lead-based paint hazards during sales and rentals of housing built before 1978. Buyers and renters will receive specific information on lead-based paint in the housing as well as a Federal pamphlet with practical, low-cost tips on identifying and controlling lead-based paint hazards. Sellers, landlords, and their agents will be responsible for providing this information to the buyer or renter before sale or lease.

## LEAD-BASED PAINT IN HOUSING

Approximately three-quarters of the nation's housing stock built before 1978 (approximately 64 million dwellings) contains some lead-based paint. When properly maintained and managed, this paint poses little risk. However, 1.7 million children have blood-lead levels above safe limits, mostly due to exposure to lead-based paint hazards.

## EFFECTS OF LEAD POISONING

Lead poisoning can cause permanent damage to the brain and many other organs and causes reduced intelligence and behavioral problems. Lead can also cause abnormal fetal development in pregnant women.

## BACKGROUND

To protect families from exposure to lead from paint, dust, and soil, Congress passed the Residential Lead-Based Paint Hazard Reduction Act of 1992, also known as Title X. Section 1018 of this law directed HUD and EPA to require the disclosure of known information on lead-based paint and lead-based paint hazards before the sale or lease of most housing built before 1978.

## WHAT IS REQUIRED

Before ratification of a contract for housing sale or lease:

- Sellers and landlords must disclose known lead-based paint and lead-based paint hazards and provide available reports to buyers or renters.

- Sellers and landlords must give buyers and renters the pamphlet, developed by EPA, HUD, and the Consumer Product Safety Commission (CPSC), titled *Protect Your Family from Lead in Your Home.*



- Home buyers will get a 10-day period to conduct a lead-based paint inspection or risk assessment at their own expense. The rule gives the two parties flexibility to negotiate key terms of the evaluation.

- Sales contracts and leasing agreements must include certain notification and disclosure language.

- Sellers, lessors, and real estate agents share responsibility for ensuring compliance.

## WHAT IS NOT REQUIRED

- This rule does not require any testing or removal of lead-based paint by sellers or landlords.

- This rule does not invalidate leasing and sales contracts.

## TYPE OF HOUSING COVERED

Most private housing, public housing, Federally owned housing, and housing receiving Federal assistance are affected by this rule.

## TYPE OF HOUSING NOT COVERED

- Housing built after 1977 (Congress chose not to cover post-1977 housing because the CPSC banned the use of lead-based paint for residential use in 1978).

- Zero-bedroom units, such as efficiencies, lofts, and dormitories.

- Leases for less than 100 days, such as vacation houses or short-term rentals.

- Housing for the elderly (unless children live there).

- Housing for the handicapped (unless children live there).

- Rental housing that has been inspected by a certified inspector and found to be free of lead-based paint.

- Foreclosure sales.

## EFFECTIVE DATES

- For owners of more than 4 dwelling units, the effective date is September 6, 1996.

- For owners of 4 or fewer dwelling units, the effective date is December 6, 1996.

## THOSE AFFECTED

The rule will help inform about 9 million renters and 3 million home buyers each year. The estimated cost associated with learning about the requirements, obtaining the pamphlet and other materials, and conducting disclosure activities is about $6 per transaction.

## EFFECT ON STATES AND LOCAL GOVERNMENTS

This rule should not impose additional burdens on states since it is a Federally administered and enforced requirement. Some state laws and regulations require the disclosure of lead hazards in housing. The Federal regulations will act as a complement to existing state requirements.

---

### FOR MORE INFORMATION

- For a copy of *Protect Your Family from Lead in Your Home* (in English or Spanish) , the sample disclosure forms, or the rule, call the National Lead Information Clearinghouse (NLIC) at (800) 424–LEAD, or TDD (800) 526–5456 for the hearing impaired. You may also send your request by fax to (202) 659–1192 or by Internet E-mail to ehc@cais.com. Visit the NLIC on the Internet at http://www.nsc.org/nsc/ehc/ehc.html.

- Bulk copies of the pamphlet are available from the Government Printing Office (GPO) at (202) 512–1800. Refer to the complete title or GPO stock number 055–000–00507–9. The price is $26.00 for a pack of 50 copies. Alternatively, persons may reproduce the pamphlet, for use or distribution, if the text and graphics are reproduced in full. Camera-ready copies of the pamphlet are available from the National Lead Information Clearinghouse.

- For specific questions about lead-based paint and lead-based paint hazards, call the National Lead Information Clearinghouse at (800) 424–LEAD, or TDD (800) 526–5456 for the hearing impaired.

- The EPA pamphlet and rule are available electronically and may be accessed through the Internet.
  **Electronic Access:**
  Gopher:    gopher.epa.gov:70/11/Offices/PestPreventToxic/Toxic/lead_pm
  WWW:    http://www.epa.gov/opptintr/lead/index.html
            http://www.hud.gov
  Dial up:    (919) 558–0335
  FTP:    ftp.epa.gov (*To login, type "anonymous." Your password is your Internet E-mail address.*)

## Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

**Lead Warning Statement**
*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

(i) _____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

_____

(ii) __X__ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the lessor (check (i) or (ii) below):

(i) __✓__ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

(ii) _____ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgment (initial)**

(c) _____ Lessee has received copies of all information listed above.

(d) _____ Lessee has received the pamphlet *Protect Your Family from Lead in Your Home.*

**Agent's Acknowledgment (initial)**

(e) __Type Agent has__ informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| Karen Nunez | 06/17/2024 | _signature_ | 6/17/24 |
|---|---|---|---|
| Lessor-Landlord | Date | Lessor | Date |
| Lessee-Tenant | Date | Lessee | Date |
| Agent | Date | Agent | Date |



**GAINESVILLE HOUSING AUTHORITY**
*Where Housing Matters*

1900 SE. 4th St., Gainesville, FL 32641
Telephone (352) 872-5500 ~ Fax (352) 872-5501
www.gainesvillehousingauthority.org

EXECUTIVE DIRECTOR
PAMELA E. DAVIS

## ADDENDUM
## DRUG-FREE AND CRIMINAL FREE HOUSING

1. Tenant, any member of the tenant's household, or guest or other person under the tenant's control SHALL NOT engage in criminal activity, including drug-related criminal activity on or near the subsided premises. "Drug-related criminal activity" means the illegal manufacture, sale, distribute or use (as defined in Section 102 of the Controlled Substance Act [21 U.S.C.802]).

2. Tenant, any member of the tenant's household, or guest or other person under the tenant's control SHALL NOT engage in any act intended to facilitate criminal activity, including drug-related criminal activity, on or near said premises.

3. Tenant or members of the household will not permit the dwelling unit to be used for or to facilitate criminal activity, including drug-related criminal activity, regardless of whether the individual engaging in such an activity is a member of the household or a guest.

4. Tenant or members of the household will not engage in the manufacture, sale or distribution of illegal drugs at any location, whether on or near the dwelling unit premises or otherwise.

5. Tenant, any members of the tenant's household, or a guest or other person under the tenant's control shall not engage in acts of violence or threats of violence, including, but not limited to, the unlawful discharge of firearms on or near the dwelling unit premises.

6. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL VIOLATION OF THE LEASE AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this addendum shall be deemed a serious violation and material noncompliance with the lease. It is understood and agreed that a single violation shall be good cause for termination of the lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction but shall be by a preponderance of the evidence.

7. In case of conflict between the provisions of this addendum and any other provisions of the lease, the provisions of the addendum shall govern.

8. The LEASE ADDENDUM is incorporated into the lease, executed or renewed this day between Owner and Tenant.

| | |
|---|---|
| _Resident_ | 6/17/24  _Date_ |
| _Resident_ | _Date_ |
| _Karen Nunez_  **Landlord** | 06/17/2024  **Date** |



*Revised March 2, 2016   Page 5 of 15*

**TENANCY ADDENDUM**
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program
(To be attached to Tenant Lease)

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169

Exp. 10/31/2010

1. **Section 8 Voucher Program**

   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**

   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**

   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

   d. The tenant may not sublease or let the unit.

   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**

   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

   (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**

   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**

   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**

   a. Maintenance

   (1) The owner must maintain the unit and premises in accordance with the HQS.

   (2) Maintenance and replacement (including redecoration) must be in accordance with the

form HUD-52641-A (8/2009)
ref Handbook 7420.8

Previous editions are obsolete

standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
      (a) Pay for any utilities that are to be paid by the tenant.
      (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**

   a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

   b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
      (4) Other good cause (as provided in paragraph d).

   c. **Criminal activity or alcohol abuse.**
      (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
         (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
         (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
         (c) Any violent criminal activity on or near the premises; or
         (d) Any drug-related criminal activity on or near the premises.
      (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
         (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that

is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
         (b) Violating a condition of probation or parole under Federal or State law.
      (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
      (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

   d. **Other good cause for termination of tenancy**
      (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
      (2) During the initial lease term or during any extension term, other good cause may include:
         (a) Disturbance of neighbors,
         (b) Destruction of property, or
         (c) Living or housekeeping habits that cause damage to the unit or premises.
      (3) After the initial lease term, such good cause may include:
         (a) The tenant's failure to accept the owner's offer of a new lease or revision;
         (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
         (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).
      (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.
      (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

form HUD-52641-A (8/2009)
ref Handbook 7420.8

e. Protections for Victims of Abuse.

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public

housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. **Eviction by court action.** The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**
   (1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.
   (2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.
   (3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9. **Lease: Relation to HAP Contract**
If the HAP contract terminates for any reason, the lease terminates automatically.

10. **PHA Termination of Assistance**
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11. **Family Move Out**
The tenant must notify the PHA and the owner before the family moves out of the unit.

12. **Security Deposit**
   a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)
   b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.
   c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

form HUD-52641-A (8/2009)
ref Handbook 7420.8

d.  If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

### 13.  Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

### 14.  Conflict with Other Provisions of Lease

a.  The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b.  In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

### 15.  Changes in Lease or Rent

a.  The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b.  In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1)  If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2)  If there are any changes in lease provisions governing the term of the lease;

(3)  If the family moves to a new unit, even if the unit is in the same building or complex.

c.  PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d.  The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

### 16.  Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

### 17.  Definitions

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

Previous editions are obsolete

form HUD-52641-A (8/2009)
ref Handbook 7420.8

AP Transactions
Tenant 28279 JOHNSON, MARIA S
Gainesville Housing Authority

| Vendor | Invoice# | | | Post Date | PHA | Proj | Acct | Code | Comment | Debit | Credit |
|--------|----------|--|--|-----------|-----|------|------|------|---------|-------|--------|
| 112789 | AUTOINVC | 28279 | 2407 | 07/01/2024 | 07 | 001 | 4715.06 | 5 | JOHNSON, MARIA S | 898.00 | 0.00 |
| 112789 | AUTOINVC | 28279 | 2407 | 07/01/2024 | 07 | 001 | 1112.00 | 0 | JOHNSON, MARIA S | 0.00 | 898.00 |



**GAINESVILLE HOUSING AUTHORITY**
*Where Housing Matters*

1900 SE. 4th St., Gainesville, FL. 32641
Phone (352) 872-5500 ~ Fax (352) 872-5501
www.gainesvillehousingauthority.org

**EXECUTIVE DIRECTOR**
PAMELA E. DAVIS

06/27/2024

MARIA S. JOHNSON
2649 NW 57TH PL
GAINESVILLE, FL 32608-

TENANT NUMBER: 28279          OWNER NUMBER:     112789

The Gainesville Housing Authority (GHA) is in receipt of your Lease that was executed on 07/01/2024. **The amounts below reflect portions of rent to the owner/landlord by GHA and you, as the Tenant, for an entire month.  If your move-in date is prior to the first of the month, then <u>your landlord will calculate and collect a proration of $  902.00.</u>**

**If your Lease was executed on the first of the month, then pay the Tenant Rent amount below, until further notice.  Also, keep in mind that this is an "income based" program, so please report changes in a timely manner.**

| | |
|---|---|
| HOUSING ASST. PYMT. | 898.00 |
| **TENANT RENT** | **902.00** |
| CONTRACT RENT | 1800.00 |
| UTILITY PAYMENT | 0.00 |

If you are eligible for a Utility Allowance Payment or a prorated amount, then that amount will also be effective on 07/01/2024.  In addition, the Housing Assistance Payments will be made from this office and directly to the owner/landlord. The Contract Rent is the total amount of the rent due to the landlord from GHA and the tenant.

**Family Composition:**  Number in Family:   **6  Minor(s): 4**

This notice is presented to you in accordance with the terms and conditions of the Housing Assistance Payments Contract (HAP Contract) and/or Lease Agreement.

**TENANT:  IF YOU DISAGREE WITH THIS DECISION, YOU MAY REQUEST AN INFORMAL HEARING.  If a hearing is desired, you MUST submit a written request to this office by 07/07/2024 or your right to a Informal Hearing will be waived.**

Karen Nunez
5658 SW 104th Terrace
Gainesville, FL 32608

Processed by:  Sara Croissy
Authorized GHA Representative



```
                        GHA-FAMILY UNIFICATION PROGRAM
06/27/2024
TOTAL TENANT PAYMENT COMPUTATION WORKSHEET - S8 Housing Choice Voucher

Family#: 28279  Name: JOHNSON, MARIA S          SSN: 428598743  Effective: 07/01/2024
PHA: 07  Project: 006  Property#: 105551    BR Size:  3
HAP Voucher No. :28279        Voucher Size: 3
Family Physical Address:                            Mailing Address:
Address 1    : 2649 NW 57TH PL                      2649 NW 57TH PL
City, ST  Zip: GAINESVILLE, FL  32608-             GAINESVILLE, FL  32608-
Family Phone Numbers: 941-780-8894
```

**1) Total Annual Income**                                                    **43426.00**
**2) Deductions to Annual Income**
   a) Permissible Deductions                                        0.00
   b) Medical/Disability
      Medical/Disability Threshold (Annual Income * .03)   0.00
      Unreimbursed Disability Assistance Expense   0.00
      Maximum Disability Allowance   0.00
      Earnings Made Possible by Disability Assistance Expense   0.00
      Allowable Disability Assistance Expense   0.00
      Out of Pocket Medical Expense   0.00
      Total Disability Assistance and Medical Expenses   0.00
      Medical/Disability Assistance Allowance   0.00
   c) Elderly/Disability Allowance                                 0.00
   d) Dependent Allowance (# of Dependents:  5 * $480)          2400.00
   e) Unreimbursed Childcare Costs                                 0.00
   f) Travel Costs (IHA Only)                                      0.00
   g) Total Deductions and Allowances                          2400.00
**3) Adjusted Annual Income**                                                **41026.00**
**4) Total Tenant Payment (TTP)**
   a) TTP if based on Annual Income (Annual Income/12 * .10)      362.00
   b) TTP if based on Adjusted Annual Income                     1026.00
     (Adjusted Income/12, rounded to whole dollars, * .30)
   c) Welfare Rent ($0 if none or not applicable)                   0.00
   d) Minimum Rent ($0 if waived)                                  50.00
   e) Enhanced Voucher Minimum Rent ($0 if none or not applicable)   0.00
   f) TTP - Highest of lines 4a, 4b, 4c, 4d, 4e                 **1026.00**

```
Owner Name and Address -
Owner Name : Karen Nunez                          112789
Address 1  : 5658 SW 104th Terrace
City, ST Zip: Gainesville, FL  32608

(Calculations based on Current File: 8.8.1.1)
```

GHA-FAMILY UNIFICATION PROGRAM

06/27/2024
TOTAL TENANT PAYMENT COMPUTATION WORKSHEET - Section 8 Housing Choice Voucher - Page 2

Family#: 28279   Name: JOHNSON, MARIA S          SSN: 428598743   Effective: 07/01/2024


Payment Standard for Family                                                    1924.00
Rent to Owner                                                                  1800.00
Utility Allowance                                                               323.00

Gross Rent of Unit: Rent to Owner + Utility Allowance                          2123.00
Subsidy Standard: Lower of Payment Standard or Gross Rent                      1924.00
Total Tenant Payment (TTP)                                                     1026.00
Total HAP: Subsidy Standard - TTP                                               898.00

**Rent Calculation**
Total Family Share  : Gross Rent - Total HAP                                   1225.00
HAP Payment to Owner: Lower of Rent or Total HAP                                898.00
Utility Reimbursement to Family: Total HAP - HAP to Owner                         0.00
 not to exceed Utility Allowance
Tenant Rent to Owner: Rent - HAP to Owner                                       902.00


**Rent Charged by Owner**                    :    1800.00
**TTP**                                      :    1026.00
**Utility Allowance**                        :     323.00
**HAP Payment to Owner**                     :     898.00
**Utility Reimbursement to Family**          :       0.00
**Family Share of Rent**                     :    1225.00
**Tenant Rent to Owner: Rent - HAP to Owner** :     902.00


(Calculations based on Current File: 8.8.1.1)

# Voucher

**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**

OMB No. 2577-0169
(exp. 04/30/2026)

**Office of Public and Indian Housing**

**OMB Burden Statement:** The public reporting burden for this information collection is estimated to be up to 0.05 hours, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This collection of information is required for participation in the housing choice voucher program.  Assurances of confidentiality are not provided under this collection. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions to reduce this burden, to the Office of Public and Indian Housing, US. Department of Housing and Urban Development, Washington, DC 20410. HUD may not conduct and sponsor, and a person is not required to respond to, a collection of information unless the collection displays a valid control number.

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information on this form by 24 CFR § 982.302. The information is used to authorize a family to look for an eligible unit and specifies the size of the unit. The information also sets forth the family's obligations under the Housing Choice Voucher Program. The Personally Identifiable Information (PII) data collected on this form are not stored or retrieved within a system of record.

| | |
|---|---|
| Please read **entire** document before completing form<br>Fill in all blanks below. Type or print clearly. | Voucher Number<br><br>28279 |
| 1. Insert **unit size** in number of bedrooms. (This is the number of bedrooms for which the Family qualifies, and is used in determining the amount of assistance to be paid on behalf of the Family to the owner.) | 1.  Unit Size<br><br>3 |
| 2. **Date Voucher Issued (mm/dd/yyyy)** Insert actual date the Voucher is issued to the Family. | 2.  Issue Date (mm/dd/yyyy)<br><br>06/14/2024 |
| 3.  **Date Voucher Expires (mm/dd/yyyy)** must be at least sixty days after date Voucher is issued. (See Section 6 of this form.) | 3. Expiration Date   (mm/dd/yyyy)<br><br>08/13/2024 |
| 4.  **Date Extension Expires** (if applicable)(mm/dd/yyyy) (See Section 6. of this form) | 4. Date Extension Expires (mm/dd/yyyy) |

| 5. Name of Family Representative<br><br>JOHNSON, MARIA S | 6.  Signature of Family Representative | Date Signed (mm/dd/yyyy)<br><br>06/14/2024 |
|---|---|---|

7. Name of Public Housing Agency (PHA)

## GHA-FAMILY UNIFICATION PROGRAM

| 8. Name and Title of PHA Official<br><br>SARA CROISSY - HCVP COORDINATOR | 9.  Signature of PHA Official<br><br>*Sara Croissy* | Date Signed (mm/dd/yyyy)<br><br>06/14/2024 |
|---|---|---|

**1. Housing Choice Voucher Program**

   A.   The public housing agency (PHA) has determined that the above named family (item 5) is eligible to participate in the housing choice voucher program. Under this program, the family chooses a decent, safe and sanitary unit to live in. If the owner agrees to lease the unit to the family under the housing choice voucher program, and if the PHA approves the unit, the PHA will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

   B.   The PHA determines the amount of the monthly housing assistance payment to be paid to the owner. Generally, the monthly housing assistance payment by the PHA is the difference between the applicable payment standard and 30 percent of monthly adjusted family income. In determine the maximum initial housing assistance payment for the family, the PHA will use the payment standard in effect on the date the tenancy is approved by the PHA. The family may choose to rent a unit for more than the payment standard, but this choice does not change the amount of the PHA's assistance payment. The actual amount of the PHA's assistance payment will be determined using the gross rent for the unit selected by the family.

**2. Voucher**

   A.   When issuing this voucher the PHA expects that if the family finds an approval unit, the PHA will have the money available to enter into a HAP contract with the owner. However, the PHA is under no obligation to the family, to any owner, or to any other person, to approve a tenancy. The PHA does not have any liability to any party by the issuance of this voucher.

   B.   The voucher does not give the family any right to participate in the PHA's housing choice voucher program. The family becomes participant in the PHA's housing choice voucher program when the HAP contract between the PHA and the owner takes effect.

   C.   During the initial or any extended term of this voucher, the PHA may require the family to report progress in leasing a unit at such intervals and times as determined by the PHA.

**3. PHA Approval or Disapproval of Unit or Lease**

   A.   When the family finds a suitable unit where the owner is willing to participate in the program, the family must give the PHA the request for tenancy approval (of the form supplied by the PHA), signed by the owner and the family, and a copy of the lease, including the HUD-prescribed tenancy addendum. **Note: Both documents must be given to the PHA no later than the expiration date stated in item 3 or 4 on top of page one of this voucher.**

   B.   The family must submit these documents in the manner that is required by the PHA. PHA policy may prohibit the family from submitting more than one request for tenancy approval at a time.

   C.   The lease must include, word-for-word, all provisions of the tenancy addendum required by HUD and supplied by the PHA. This is done by adding the HUD tenancy addendum to the lease used by the owner. If there is a difference between any provisions of the HUD tenancy addendum and any provisions of the owner's lease, the provision of the HUD tenancy addendum shall control.

   D.   After receiving the request for tenancy approval and a copy of the lease, the PHA will inspect the unit. The PHA may not give approval for the family to lease the unit or execute the HAP contract until the PHA has determined that all the following program requirements are met: the unit is eligible; the unit has been inspected by the PHA and passes the housing quality standards (HQS); the rent is reasonable; and the landlord and tenant have executed the lease including the HUD-prescribed tenancy addendum.

   E.   If the PHA approves the unit, the PHA will notify the family and the owner, and will furnish two copies of the HAP contract to the owner.

         1.   The owner and the family must execute the lease.

         2.   The owner must sign both copies of the HAP contract and must furnish to the PHA a copy of the executed lease and both copies of the executed HAP contract.

         3.   The PHA will execute the HAP contract and return an executed copy to the owner.

   F.   If the PHA determined that the unit or lease cannot be approved for any reason, the PHA will notify the owner and the family that:

         1.   The proposed unit or lease is disapproved for specified reasons, and

         2.   If the conditions requiring disapproval are remedied to the satisfaction of the PHA on or before the date specified by the PHA, the unit or lease will be approved.

**4. Obligations of the Family**

   A.   When the family's unit is approved and the HAP contract is executed, the family must follow the rules listed below in order to continue participating in the housing choice voucher program.

   B.   The family must:

         1.   Supply any information that the PHA or HUD determined to be necessary including evidence of citizenship or eligible immigration status, and information for use in a regularly schedule reexamination or interim reexamination of family income and composition.

form **HUD-52646** (04/2023)

2. Disclose and verify social security numbers and sign and submit consent forms for obtaining information.
3. Supply any information requested by the PHA to verify that the family is living in the unit or information related to family absence from the unit.
4. Promptly notify the PHA in writing when the family is away from the unit for an extended period of time in accordance with PHA policies.
5. Allow the PHA to inspect the unit at reasonable times and after reasonable notice.
6. Notify the PHA and the owner in writing before moving out of the unit or terminating the lease.
7. Use the assisted unit for residence by the family. The unit must be the family's only residence.
8. Promptly notify the PHA in writing of the birth, adopting, or court-awarded custody of a child.
9. Request PHA written approval to add any other family member as an occupant of the unit.
10. Promptly notify the PHA in writing if any family member no longer lives in the unit. Give the PHA a copy of any owner eviction notice.
11. Pay utility bills and provide and maintain any appliances that the owner is not required to provide under the lease.

C. Any information the family supplies must be true and complete.
D. The family (including each family member) must not:

1. Own or have any interest in the unit (other than in a cooperative, or the owner of a manufactured home leasing a manufactured home space).
2. Commit any serious or repeated violation of the lease.
3. Commit fraud, bribery or any other corrupt or criminal act in connection with the program.
4. Engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.
5. Sublease or let the unit or assign the lease or transfer the unit.
6. Receive housing choice voucher program housing assistance while receiving another housing subsidy, for the same unit or a different unit under any other Federal, State, or local housing assistance program.
7. Damage the unit or premises (other than damage from ordinary wear and tear) or permit any guest to damage the unit or premises.
8. Receive housing choice voucher program housing assistance while residing in a unit owned by a parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.
9. Engage in abuse of alcohol in a way that threatens the health, safety or right to peaceful enjoyment of the other residents and persons residing in the immediate vicinity of the premises.

**5. Illegal Discrimination**

If the family has reason to believe that, in its search for suitable housing, it has been discriminated against on the basis of age, race, color, religion, sex (including sexual orientation and gender identity), disability, national origin, or familial status, the family may file a housing discrimination complaint with any HUD Field Office in person, by mail, or by telephone. The PHA will give the family information on how to fill out and file a complaint.

**6. Expiration and Extension of Voucher**

The voucher will expire on the date stated in item 3 on the top of page one of the voucher unless the family requests an extension in writing and the PHA grants a written extension of the voucher in which case the voucher will expire on the date stated in item 4. At its discretion, the PHA may grant a family's request for one or more extensions of the initial term.

If the family needs and requests an extension of the initial voucher term as a reasonable accommodation, in accordance with part 8 of this title, to make the program accessible to a family member who is a person with disabilities, the PHA must extend the voucher term up to the term reasonably required for that purpose.

.

GAINESVILLE HOUSING AUTHORITY
HCV Program
Inspection Request

Date to Inspector    6/20/2024

Coordinator    SARA CROISSY

Participant ID    28279

Participant Name    MARIA JOHNSON

Participant Phone/Email    941-780-8894 / GREENMARIA008@GMAIL.COM

Vendor Number    112789

Landlord's Name    KAREN NUNEZ

Owner's Phone/Email    352-339-0634 / KAREN.GREENTREE@YAHOO.COM

Property Number    105551

Inspection Property Address    2649 NW 57TH PL

GAINESVILLE, FL 32608

Inspection Type    Initial    Special    Annual

Date Available    ASAP    x    RFTA _____    Landlord _____    Participant

Date Inspected    2024- 06-25

Date To Coordinator    PASS



1900 SE. 4th St., Gainesville, FL 32641
Phone (352) 872-5500 ~ Fax (352) 872-5501
www.gainesvillehousingauthority.org

**GAINESVILLE HOUSING AUTHORITY**
*Where Housing Matters*

EXECUTIVE DIRECTOR
PAMELA E. DAVIS

06/25/2024

**Tenant 28279**
MARIA S. JOHNSON
8851 W COUNTY RD 18
LAKE BUTLER, FL32054-

**Property ID 105551**

**Landlord    112789**
Karen Nunez
5658 SW 104th Terrace
Gainesville, FL, 32608

Dear Participant/Landlord:

On 06/25/2024 a(n) Housing Quality Standards (HQS) inspection **or** Self-Certification was conducted at 2649 NW 57TH PL in accordance with the HUD standards. The result of this inspection is below:

  Your unit inspection resulted in a **PASS** rating per HQS.

_____  Your Self-Certification resulted in a **PASS** rating per HQS

We thank you for taking the necessary measures to ensure that the unit is in compliance with HUD's Housing Quality Standards to ensure our participants are living in decent, safe and sanitary housing.

If you have any questions regarding this letter or inspection results please call us at 352-872-5500 ext. 7124 or email to charlese@gnvha.org.

Kind Regards,

*Charles England*
Charles England
Authorized GHA Representative



**Inspection Form**
Housing Choice Voucher Program

**U.S Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 04/30/2026)

OMB Burden Statement: The public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The information is used to determine if a unit meets the housing quality standards of the section 8 rental assistance program. Assurances of confidentiality are not provided under this collection. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions to reduce this burden, to the Office of Public and Indian Housing, US. Department of Housing and Urban Development, Washington, DC 20410. HUD may not conduct and sponsor, and a person is not required to respond to, a collection of information unless the collection displays a valid control number.

Privacy Notice: The Department of Housing and Urban Development (HUD) is authorized to coll ect the information required on this form by 24 CFR § 982.401. The information is used to determine if a unit meets the housing quality standards of the Section 8 rental assistance program. The Personally Identifiable Information (PII) data collected on this form are not stored or retrieved within a system of record.

| PHA Gainesville Housing Authority | | | | Tenant ID Number 28279 | Date of Request (mm/dd/yyyy) 6/20/2024 |
|---|---|---|---|---|---|
| Inspector Charles England | | | | Date Last Inspection (mm/dd/yyyy) 6/20/2024 | Date of Inspection (mm/dd/yyyy) 6/25/2024 |
| Neighborhood/Census Tract | | | Type of Inspection ☐ Initial ☐ Special ☑ Reinspection | | Project Number |

| A. General Information Street Address of Inspected Unit **2649 NW 57TH PL** | | | | Housing Type (check as appropriate) |
|---|---|---|---|---|
| City **GAINESVILLE** | County ALACHUA | State FL | Zip 32608- | ☑ Single Family Detached |
| Name of Family **MARIA S JOHNSON** | | Current Telephone of Family 941-780-8894 | | ☐ Duplex or Two Family |
| | | | | ☐ Row House or Town House |
| Current Street Address of Family **8851 W COUNTY RD 18** | | | | ☐ Low Rise: 3, 4 Stories, Including Garden Apartment |
| City LAKE BUTLER | County ALACHUA | State FL | Zip | ☐ High Rise: 5 or More Stories |
| | | | | ☐ Manufactured Home |
| Number of Children in Family Under 6 1 | | | | ☐ Congregate |
| | | | | ☐ Cooperative |
| | | | | ☐ Independent Group Residence |
| Name of Owner or Agent Authorized to Lease Unit Inspected Karen Nunez | | Telephone of Owner or Agent 352-339-0634 | | ☐ Single Room Occupancy |
| | | | | ☐ Shared Housing |
| Address of Owner or Agent 5658 SW 104th Terrace Gainesville, FL 32608 | | | | ☐ Other |

I/We, the undersigned, certify under penalty of perjury that the information provided above is true and correct. WARNING: Anyone who knowingly submits a false claim or make a false statement is subject to criminal and/or civil penalties, including confinement for up to 5 years, fines, and civil and administrative penalties. (18 U.S.C #167#167 287, 1001, 1010, 1012; 31 U.S.C. #167 3729, 3802).

Inspector Signature _____

Date _____

File Review Self Check Sheet

Tenant ID: 28279 - JOHNSON, MARIA S

Transaction Type: MI          Effective Date: 07/01/2024   Special Program: 006

Voucher Size: ____3____   Effective Date of Voucher: _____

Housing Coordinator verified that the following information is scanned into tenant e-files:

- ☐ Social Security Card for each household member
- ☐ Birth Certificate for each household member
- ☐ 214 for each household member
- ☐ Form 9886 for every household member over 18 years of age
- ☐ EIV certification
- ☑ Current HAP contract
- ☑ Current RFTA form
- ☑ Current Rent Reasonableness
- ☑ Third Party Income Verification?
    - o   If yes, verify that your numbers match those entered on the 50058
- ☑ Does the Utility Allowance match the HAP & the RFTA and the participant provided Utility Bill?


Housing Coordinator Signature: _____*Sara Croissy*_____ Date: 06/27/2024 _____

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**

   # JOHNSON, MARIA S

3. **Contract Unit**

   ## 07 006 105551 2649 NW 57TH PL GAINESVILLE, FL 32608-

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   JOHNSON, MARIA S
   JOHNSON, JAHKERIA N
   GREEN, JAHKWON M
   GREEN, JASHUN T
   THOMAS, JAKEVIN
   WATKINS, JAMES O

5. **Initial Lease Term**

   The initial lease term begins on (mm/dd/yyyy): 07/01/2024

   The initial lease term ends on (mm/dd/yyyy): 06/30/2025

6. **Initial Rent to Owner**
   The initial rent to owner is: $ 1,800.00
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 898.00 per month.
   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

8. Utilities and Appliances
The owner shall provide or pay for the utilities/appliances indicated below by an "O". The tenant shall provide or pay for the utilities/appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and provide the refrigerator and range/microwave.

| Item | Specify fuel type | | | | | | Paid by |
|---|---|---|---|---|---|---|---|
| Heating | ☑ Natural gas | ☐ Bottled gas | ☐ Electric | ☐ Heat Pump | ☐ Oil | ☐ Other | T |
| Cooking | ☐ Natural gas | ☐ Bottled gas | ☑ Electric | | | ☐ Other | T |
| Water Heating | ☑ Natural gas | ☐ Bottled gas | ☐ Electric | | ☐ Oil | ☐ Other | T |
| Other Electric | | | | | | | T |
| Water | | | | | | | T |
| Sewer | | | | | | | T |
| Trash Collection | | | | | | | O |
| Air Conditioning | | | | | | | T |
| Other (specify) | | | | | | | Provided by |
| Refrigerator | | | | | | | O |
| Range/Microwave | | | | | | | O |

**Signatures**
I/We, the undersigned, certify under penalty of perjury that the information provided above is true and correct. WARNING: Anyone who knowingly submits a false claim or makes a false statement is subject to criminal and/or civil penalties, including confinement for up to 5 years, fines, and civil and administrative penalties. (18 U.S.C. § 287, 1001, 1010, 1012; U.S.C. § 3729, 3802).

**Public Housing Agency**                                    **Owner**

GHA-FAMILY UNIFICATION PROGRAM                               Karen Nunez
Print or Type Name of PHA                                    Print or Type Name of Owner


Signature                                                    Signature

SARA CROISSY - HCVP COORDINATOR                              KAREN NUNEZ -
Print or Type Name and Title of Signatory                    Print or Type Name and Title of Signatory

06/27/2024                                                   06/27/2024
Date (mm/dd/yyyy)                                            Date (mm/dd/yyyy)

                           Mail payments to:                 Karen Nunez
                                                             Name

                                                             5658 SW 104th Terrace

                                                             Gainesville, FL 32608
                                                             Address (street, city, state, zip code)

GAINESVILLE HOUSING AUTHORITY
HCV Program
Inspection Request

Date to Inspector _____ 6/20/2024

Coordinator _____ SARA CROISSY

Participant ID _____ 28279

Participant Name _____ MARIA JOHNSON

Participant Phone/Email _____ 941-780-8894 / GREENMARIA008@GMAIL.COM

Vendor Number _____ 112789

Landlord's Name _____ KAREN NUNEZ

Owner's Phone/Email _____ 352-339-0634 / KAREN.GREENTREE@YAHOO.COM

Property Number _____ 105551

Inspection Property Address _____ 2649 NW 57TH PL

GAINESVILLE, FL 32608

Inspection Type _____ Initial    Special    Annual

Date Available _____ ASAP    x    RFTA _____ Landlord _____ Participant
Date Inspected _____
Date To Coordinator _____

# EXHIBIT C



**Kevin Rabin <kevin.rabin@trls.org>**

## FW: Deficiency List

1 message

**Maria Johnson** <mariag@gnvha.org>                                Mon, Jul 29, 2024 at 8:42 AM
To: "kevin.rabin@trls.org" <kevin.rabin@trls.org>

Good morning Kevin,

Please see email thread below between our inspector Charles England and Mrs. Karen regarding the reason for the initial failed inspection.

Thank you all again for your help.

I look forward to speaking with you soon.

Thank You.

Kind Regards,

""Tremendous amounts of talent are lost to our society because that talent wears a skirt."

~Shirley Chisholm ~



**Rate My Service**

**Your feedback is important to us! Please take a few moments to rate the service that was provided to you by scanning the QR code above, or simply click the link below:**

**Please Rate my Customer Service:** https://gainesvillehousingauthority.org/customer-survey/



**Maria Johnson**
*INTAKE SPECIALIST*

**P 352.872.5500**
ext. 7302
**F 352.872.5502**

1900 SE 4th Street
Gainesville, Florida 32641

**GainesvilleHousingAuthority.org**
*GHA is CUSTOMER focused and PERFORMANCE driven!*

Florida has a very broad public records law. Under Florida law, both the content of e-mails and e-mail addresses are public records. If you do not want the content of your e-mail or your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in person.

---

**From:** Charles England <CharlesE@GNVHA.ORG>
**Sent:** Thursday, June 20, 2024 1:58 PM
**To:** karen.greentree@yahoo.com
**Cc:** Maria Johnson <mariag@gnvha.org>
**Subject:** FW: Deficiency List

FYI



**Charles G. England**
*Housing Inspector*

**P 352.872.5500**
ext. 7124
**F 352.872.5529**

1900 SE 4th Street
Gainesville, Florida 32641

**GainesvilleHousingAuthority.org**

*GHA is CUSTOMER focused and PERFORMANCE driven!*

**Please Rate my Customer Service:** https://gainesvillehousingauthority.org/customer-survey/

Florida has a very broad public records law. Under Florida law, both the content of e-mails and e-mail addresses are public records. If you do not want the content of your e-mail or your e-mail address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in person.

---

**From:** Charles England
**Sent:** Thursday, June 20, 2024 10:50 AM
**To:** Maria Johnson <mariaj@gnvha.org>; Maria Johnson <mariaj@gnvha.org>
**Subject:** Deficiency List

Property #: 105551
Property Address#: 2649 NW 57TH PL
Tenant: 28279 - MARIA S JOHNSON

Inspection 1836358 was completed with a Fail status. Completed Time is 06-20-2024 10:37 AM

Responsible Party: Owner

Area: Additional Bathroom 1
Room: Additional Bathroom 1 Right/Rear/Floor 1
Item: Electrical Hazards
Repair: All outlets within a wet area must be GFCI protected
Completed: No
Comments: None

Area: Heating & Plumbing
Item: Water Heater
Repair: TPR valve is obstructed. The relief valve discharge pipe must not have an upward or otherwise restricted flow. This could be a safety risk to the resident due to a rupturing water heater, which may result in injury. - 30 day required repair
Completed: No
Comments: None

Area: Entrance hall, corridors, halls, stairs
Room: Entrance hall, corridors, halls, stairs Center/Center/Floor 1
Item: Smoke Detectors
Repair: Make smoke detector operable.
Completed: No
Comments: None

Area: Bathroom
Item: Electrical Hazards
Repair: All outlets within a "wet" area must be GFCI Protected
Completed: No
Comments: None

Area: Bedroom 3
Room: Bedroom 3 Right/Rear/Floor 1
Item: Security

Repair: Repair/replace broken door lock. Sliding glass door doesn't work properly
Completed: No
Comments: None

Area: Bedroom 3
Room: Bedroom 3 Right/Rear/Floor 1
Item: Smoke Detectors
Repair: Install missing smoke detector.
Completed: No
Comments: None

Area: Bedroom 1
Room: Bedroom 1 Right/Front/Floor 1
Item: Smoke Detectors
Repair: Install missing smoke detector.
Completed: No
Comments: None

Area: Laundry Room
Room: Laundry Room Left/Rear/Floor 1
Item: Electrical Hazards
Repair: All outlets within a wet area must be GFCI protected or a dedicated outlet
Completed: No
Comments: None

Area: Building Exterior
Item: Condition of Exterior Surfaces
Repairs: None
Comment: Repair outside window sill

Area: General Health & Safety
Item: Other Interior Hazards
Repair: 5LB FIRE EXTINGUISHER IS REQUIRED TO BE IN UNIT THAT IS CERTIFIED & HOLD A CURRENT TAG
BY A LICENSED FIRE EXTINGUISHER COMPANY - 24 HOUR REQUIRED REPAIR/REPLACEMENT
Completed: No
Comments: None

Area: Bedroom 2
Room: Bedroom 2 Right/Center/Floor 1
Item: Smoke Detectors
Repair: Install missing smoke detector.
Completed: No
Comments: None

Area: Kitchen
Item: Stove or Range with Oven
Repair: Repair defective oven.
Completed: No
Comments: None

Area: Kitchen
Item: Electrical Hazards
Repair: All outlets within a "wet" area must be GFCI Protected
Completed: No
Comments: None

_____

Responsible Party: Tenant


Area: Building Exterior

Item: Condition of Exterior Surfaces
Repairs: None
Comment: Repair outside window sill















Sent from my iPad

# EXHIBIT D



1900 SE. 4th St., Gainesville, FL 32641
Phone (352) 872-5500 ~ Fax (352) 872-5501
www.gainesvillehousingauthority.org

**GAINESVILLE HOUSING AUTHORITY**
*Where Housing Matters*

EXECUTIVE DIRECTOR
PAMELA E. DAVIS

**06/25/2024**

**Tenant 28279**
MARIA S. JOHNSON
8851 W COUNTY RD 18
LAKE BUTLER, FL32054-

**Property ID 105551**

**Landlord    112789**
Karen Nunez
5658 SW 104th Terrace
Gainesville, FL, 32608

Dear Participant/Landlord:

On 06/25/2024 a(n) Housing Quality Standards (HQS) inspection **or** Self-Certification was conducted at 2649 NW 57TH PL in accordance with the HUD standards. The result of this inspection is below:

X    Your unit inspection resulted in a **PASS** rating per HQS.

_____    Your Self-Certification resulted in a **PASS** rating per HQS

We thank you for taking the necessary measures to ensure that the unit is in compliance with HUD's Housing Quality Standards to ensure our participants are living in decent, safe and sanitary housing.

If you have any questions regarding this letter or inspection results please call us at 352-872-5500 ext. 7124 or email to charlese@gnvha.org.

Kind Regards,

Charles England
Charles England
Authorized GHA Representative



# EXHIBIT E

**Report Title: Tenant Activity Details**
**Report Date: 07/11/2024 15:33:53**
**Printed By: Maria Green**
**Tenant Name: JOHNSON, MARIA S**

| Description | Date Added | Added By |
|---|---|---|
| Letter Printed | 6/27/2024 3:24:35 PM | Sara Croissy |
| G:\LAC\LETTERS\S8-MoveInRentNotice.rtf - 1 copy | | |
| Reports Printed | 6/27/2024 3:13:02 PM | Sara Croissy |
| (HAP Contract)All Pages(PDF) - 1 copy HUD-Form 50058/ HUD-Form 50059/ RCD 1944-8 - 1 copy TTP Worksheet - 1 copy | | |
| Dropped from Waiting List: SF MOVEIN | 6/27/2024 3:10:40 PM | Sara Croissy |
| Reports Printed | 6/25/2024 4:01:39 PM | Charles England |
| 52580 Inspection form - 1 copy Pass Inspection Letter - 2 copies | | |
| Reports Printed | 6/20/2024 2:07:37 PM | Charles England |
| 52580 Inspection form - 1 copy Inspection Failure Notice - 3 copies | | |
| Reports Printed | 6/20/2024 7:51:22 AM | Sara Croissy |
| Housing Choice Voucher Form(PDF) - 1 copy HUD-Form 50058/ HUD-Form 50059/ RCD 1944-8 - 1 copy | | |
| Reports Printed | 6/17/2024 2:53:14 PM | Sara Croissy |
| TTP Worksheet - 1 copy | | |

\<Filter is Empty>

| Description | Date Added | Added By |
|---|---|---|
| Reports Printed | 6/17/2024 11:34:23 AM | Maria Green |
| TTP Worksheet - 1 copy | | |
| Reports Printed | 6/17/2024 11:31:18 AM | Maria Green |
| TTP Worksheet - 1 copy | | |
| Reports Printed | 5/31/2024 1:23:51 PM | Maria Green |
| TTP Worksheet - 1 copy | | |
| Reports Printed | 5/3/2024 4:53:06 PM | Ruchelle Hobbs |
| Application for Admission or Continued Occupancy - 1 copy<br>TTP Worksheet - 1 copy | | |
| Reports Printed | 5/3/2024 4:44:47 PM | Sara Croissy |
| TTP Worksheet - 1 copy | | |
| Reports Printed | 5/3/2024 4:42:43 PM | Sara Croissy |
| TTP Worksheet - 1 copy | | |
| Reports Printed | 5/3/2024 4:16:09 PM | Sara Croissy |
| Application for Admission or Continued Occupancy - 1 copy<br>TTP Worksheet - 1 copy | | |
| Reports Printed | 5/3/2024 2:50:35 PM | Sara Croissy |
| Application for Admission or Continued Occupancy - 1 copy<br>TTP Worksheet - 1 copy | | |

<Filter is Empty>

**Report Title: Hap Invoice History**
**Report Date: 07/11/2024 15:33:40**
**Printed By: Maria Green**

| HAP Date | Invoice # | Invoice Date | Vendor # | Vendor Name | Check # | Check Date | Amount |
|---|---|---|---|---|---|---|---|
| 7/1/2024 | AUTOINVC  28279 2407 | 7/1/2024 | 112789 | Karen Nunez | | | $898.00 |

# EXHIBIT F

RENTAL AGREEMENT

Landlord: Karen Nunez, 5658 SW 104th Terrace Gainesville, FL 32608

Tenant: Maria Green

Property Address: 2649 NW 57th Place Gainesville, FL 32653

1. TERM. This Rental Agreement shall be for one year beginning July 1, 2024 and ending June 30, 2025. Upon default or if Landlord resorts to court process to enforce lease the remaining rent due for the balance of the lease shall become immediately due and payable.

2. RENT. The rent shall be $1800.00 per month and shall be mailed to the landlord's address above or direct deposited. Payments must be postmarked on or before the 5th day of each month. Payments postmarked on the sixth are considered late, and a late charge of $50 shall be due; payments postmarked after the sixth accrue and additional late fee of $5.00 per day for each postmarked date after the sixth. Tenant agrees to pay a $50 fee in the event a check bounces, late fees will be due until check is made good; Landlord may then require certified funds for the remainder of the lease. All payments received shall first be applied to any outstanding charges (such as late charges) incurred by Tenant prior to applying the same to current monthly rent.

3. DEFAULT. In the event Tenant defaults under any terms of the agreement, Landlord may recover possession as provided by Law and seek monetary damages.

4. SECURITY. $1000.00 security deposit to be paid by July 31st 2024.

5. UTILITIES. Tenant agrees to pay all utility charges on the property.

6. MAINTENANCE. Tenant has examined the property, acknowledges it to be in good repair. Tenant agrees to keep the premises in good repair and to do all minor maintenance promptly and provide extermination service. If maintenance is required Landlord shall be notified immediately. Tenant is not to allow any person on premises to evaluate or repair any part of the premises without Landlord consent.

7. LOCKS. Locks cannot be changed without contacting Landlord first.

8. ASSIGNMENT. This agreement may not be assigned by Tenant without the written consent of the Landlord.

9. USE. Tenant shall not use the premises for any illegal purpose or any purpose which will increase the rate of insurance and shall not cause a nuisance for Landlord or neighbors.

10. LAWN. Tenant agrees to maintain the lawn and shrubbery on the premises at his own expense.

11. LIABILITY. Tenant shall be responsible for insurance on his own property and agrees not to hold Landlord liable for any damages to Tenant's property on the premises.

12. ACCESS. Landlord reserves the right to enter the premises for the purposes of inspection, repairs, and to show prospective tenants or purchasers.

13. PETS. No pets allowed on premises.

14. OCCUPANCY. The premises shall not be occupied by more than 1 adult and 3 children. Any adult residing at the residence for more than 21 days must be approved and added to the lease.

15. TENANTS APPLIANCES. Tenant agrees not to use any alternative methods of heating. Also, no fixtures or appliances drawing excessive current without consent of Landlord.

16. PARKING. Tenant agrees that no parking is allowed on the premises except in driveway and garage.

17. FURNISHING. All the following items are to be returned in good condition at the termination of the agreement, Refrigerator, range, dishwasher.

18. ALTERATIONS AND IMPROVEMENTS. Tenant shall make no alterations to the property without the written consent of the Landlord and any such alterations or improvements shall become the property of the Landlord.

19. ENTIRE AGREEMENT. This rental agreement constitutes the entire agreement between the parties and may not be modified except in writing signed by both parties.

20. ATTORNEYS FEES. In the event it becomes necessary to enforce this agreement between the parties, tenant shall be required to pay Landlord's attorney fees.

21. SEVERABILITY. In the event any section of this agreement shall be held to be invalid all remaining provisions shall remain in force.

22. WAIVER. Any failure by Landlord to exercise any rights under this agreement shall not constitute a waiver of Landlord's rights.

23. SUBORDINATION. Tenants interest in the premises shall be subordinate to any encumbrances now or hereafter placed on the premises, to any advances made under such encumbrances and to any extensions or renewals thereof. Tenant agrees to sign any documents indicating such subordination which may be required by lenders.

24. SURRENDER OF PREMISES. At the expiration of the term of this lease, Tenant shall immediately surrender the premises in as good condition as at the start of this lease.

25. LIENS. The estate of the Landlord shall not be subject to any liens for improvements contracted by Tenant.

26. RADON GAS. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

27. LEAD BASE PAINT. Housing built before 1978 may contain lead-based paint. Tenant has been provided with the pamphlet "Protect your Family".

28. PEST CONTROL. Landlord does not provide pest control. The following parties have reviewed the information and agree to the terms of this rental agreement.

_Karen Nunez_ Lessor

_Maria John_ Lessee

# EXHIBIT G

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   - Part A: Contract Information
   - Part B: Body of Contract
   - Part C: Tenancy Addendum

2. **Tenant**

   # JOHNSON, MARIA S

3. **Contract Unit**

   ## 07 006 105551 2649 NW 57TH PL GAINESVILLE, FL 32608-

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   JOHNSON, MARIA S
   JOHNSON, JAHKERIA N
   GREEN, JAHKWON M
   GREEN, JASHUN T
   THOMAS, JAKEVIN
   WATKINS, JAMES O

5. **Initial Lease Term**

   The initial lease term begins on (mm/dd/yyyy): 07/01/2024

   The initial lease term ends on (mm/dd/yyyy): 06/30/2025

6. **Initial Rent to Owner**
   The initial rent to owner is: $ 1,800.00
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 898.00 per month.
   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

## 8. Utilities and Appliances

The owner shall provide or pay for the utilities/appliances indicated below by an "**O**". The tenant shall provide or pay for the utilities/appliances indicated below by a "**T**". Unless otherwise specified below, the owner shall pay for all utilities and provide the refrigerator and range/microwave.

| Item | Specify fuel type | | | | | | Paid by |
|---|---|---|---|---|---|---|---|
| Heating | ☑ Natural gas | ☐ Bottled gas | ☐ Electric | ☐ Heat Pump | ☐ Oil | ☐ Other | T |
| Cooking | ☐ Natural gas | ☐ Bottled gas | ☑ Electric | | | ☐ Other | T |
| Water Heating | ☑ Natural gas | ☐ Bottled gas | ☐ Electric | | ☐ Oil | ☐ Other | T |
| Other Electric | | | | | | | T |
| Water | | | | | | | T |
| Sewer | | | | | | | T |
| Trash Collection | | | | | | | O |
| Air Conditioning | | | | | | | T |
| Other (specify) | | | | | | | Provided by |
| Refrigerator | | | | | | | O |
| Range/Microwave | | | | | | | O |

## Signatures

I/We, the undersigned, certify under penalty of perjury that the information provided above is true and correct. WARNING: Anyone who knowingly submits a false claim or makes a false statement is subject to criminal and/or civil penalties, including confinement for up to 5 years, fines, and civil and administrative penalties. (18 U.S.C. § 287, 1001, 1010, 1012; U.S.C. § 3729, 3802).

**Public Housing Agency**                          **Owner**

GHA-FAMILY UNIFICATION PROGRAM
_____
Print or Type Name of PHA

Karen Nunez
_____
Print or Type Name of Owner


_____
Signature

_____
Signature

SARA CROISSY - HCVP COORDINATOR
_____
Print or Type Name and Title of Signatory

KAREN NUNEZ -
_____
Print or Type Name and Title of Signatory

06/27/2024
_____
Date (mm/dd/yyyy)

06/27/2024
_____
Date (mm/dd/yyyy)

Mail payments to:

Karen Nunez
_____
Name

5658 SW 104th Terrace
_____

Gainesville, FL 32608
_____
Address (street, city, state, zip code)

GAINESVILLE HOUSING AUTHORITY
HCV Program
Inspection Request

Date to Inspector _____6/20/2024_____

Coordinator _____SARA CROISSY_____

Participant ID _____28279_____

Participant Name _____MARIA JOHNSON_____

Participant Phone/Email _____941-780-8894 / GREENMARIA008@GMAIL.COM_____

Vendor Number _____112789_____

Landlord's Name _____KAREN NUNEZ_____

Owner's Phone/Email _____352-339-0634 / KAREN.GREENTREE@YAHOO.COM_____

Property Number _____105551_____

Inspection Property Address _____2649 NW 57TH PL_____

_____GAINESVILLE, FL 32608_____

Inspection Type    Initial    Special    Annual

Date Available _____ASAP    x    RFTA_____ Landlord _____ Participant
Date Inspected _____
Date To Coordinator _____

# EXHIBIT H

Text Message
Sun, Jun 16 at 9:16 PM

Hi Maria, this is Karen from 2649 nw 57 Place, call me tonight or in the morning if you are still interested in the house.

iMessage

Heyyyy

Karen.greentree@yahoo.com

 Mrs. Karen... my kids and I are GRATEFUL

Thank you  ... I will get it right over to you to initiate inspection



Mrs. Karen... my kids and I are GRATEFUL 🖤🖤



Thank you 🙏... I will get it right over to you to initiate inspection 🖤

Have a restful night... and, thank you and Mr. George for giving us a chance🖤

Mon, Jun 17 at 9:01 AM

Good morning

I hope your night was restful—- I went to sleep in peace.... I just wanted to thank you again— I emailed over RFTA packet

As soon as it is completed—- I will get the inspection ordered.

Ok I sent to your email so you could check it

I will do— thank you Mrs. Karen.

I know I keep saying that



That's because I mean it

WOW—- you did great....

lol

I will sign it—- and, get inspection scheduled

And, get your copy back to you.

Ok one thing I noticed is that

the printer here is questionable

Questionable—😂 😂 if you have adobe.... You can complete without printing... if that works for you—

Enjoy Tampa 🖤



Oh wow that's great



I am excited about putting you as a NEW Landlord to Gainesville Housing Authority, and I am honored to be your first....

I told me CEO the great news.... She was grateful to you also 🖤

Mon, Jun 17 at 11:29 AM

first....

I told me CEO the great news.... She was grateful to you also 🖤

Mon, Jun 17 at 11:29 AM

One more question, GRU is the electric company— correct?

Yes did you receive my paperwork?

Olaa, I will check as soon as I get back into the office —- took a lunch break. Be back in office in about 10 min

Ok I sent to your email so you could check it

I will do— thank you Mrs.

Ok I sent to your email so you could check it

I will do— thank you Mrs. Karen.

I know I keep saying that

That's because I mean it

WOW—- you did great....

lol

I will sign it—- and, get inspection scheduled

And, get your copy back to you.

Ok one thing I noticed is that

I will go buy some and with your permission put them in before inspection

Mr. Charles is going to want to see that the power works in all rooms—- he is a very good Inspector.

That won't b a problem, it just dome fixtures use more than 1 bulb

Some fixtures

I will go take a look to see how many is needed— before I go to Walmart to pick them up

Ok great

Yes ma'am—- i sent it over for

bulb

Some fixtures

I will go take a look to see how many is needed— before I go to Walmart to pick them up

Ok great

Yes ma'am—- i sent it over for approval already

Sara will process it today—- our Inspector Mr. Charles come back tomorrow



He and I will schedule an inspection date— I will let you know date tomorrow.

Mon, Jun 17 at 2:48 PM

Would you please email me a

Yes ma'am—- i sent it over for approval already

Sara will process it today—- our Inspector Mr. Charles come back tomorrow

He and I will schedule an inspection date— I will let you know date tomorrow.

Mon, Jun 17 at 2:48 PM

Would you please email me a copy of your Trust Documents and Deed please? — so that we can create your Vendor account and set up your payments via Direct Deposit

My trust docs are at home and a lot of pages and not sure about the deed. What are they looking for in the trust docs

Hey I'm nana's granddaughter she is driving my name Amelia

I'm f

Hey Amelia 🖤

Thank you for helping NaNa practice safe driving 🖤

Looks good



Perfecto—— we are good to go.

Thank you.

Tue, Jun 18 at 1:17 PM

Can you please change, I got some reason am not able to save this

Tue, Jun 18 at 1:17 PM

Can you please change, I got some reason am not able to save this

Yes ma'am— will do

Thank you

Thank u!

Wed, Jun 19 at 9:49 AM

Good morning ☀️

Good morning

I forgot where you said the key was to check the bulbs.

Wed, Jun 19 at 6:27 PM



My trust docs are at home and a lot of pages and not sure about the deed. What are they looking for in the trust docs because I feel those are kinda personal

Proof of Ownership

Is what they are looking for—- the Staff Account uses it to prove ownership, because the home is in a " Trust"—-

She can look that up online at the property appraiser and public records

Yes ma'am, she did— she just need proof to scan in your file.

Everything has been approved

Book sold send 3 back into the penal system. By purchasing the Book.... You Sponsored 3 Inmates.

Having trouble with computer, working on it

Yes ma'am, thank you.

Thu, Jun 27 at 3:58 PM

Can u call me please

Also I know that I did not update Zillow since creating the account, because it still has my last name as Green—- I would have certainly changed that.

Thank you again Mrs. Karen.

Also, I know this Program like the back of my hand—- I knew you would have to sign that HAP contract that would list everyone in my household— it would have been impossible for me to lie about that... besides Mrs. Karen, you didn't deny me because of my background— I know you wouldn't have denied me for having kids...

I just want to help you rationalize this—- if I did not lie about my background.... Why in the world would I lie about having my beautiful kids?

I do apologize for this misunderstanding.

My babies—- I would never

Everything has been approved already



I just sent you an email that give you more insight and information🤍

If you could take a look at that link I just sent to you— and, resend it to me stating that those are facts.

I would kindly appreciate it🤍

Hey I'm nana's granddaughter she is driving my name Amelia

I'm f

Hey Amelia🤍

# EXHIBIT I

 **Gmail**

---

**Lease**

---

**Karen Nunez** <karen.greentree@yahoo.com>
To: MARIA GREEN <greenmaria008@gmail.com>

Fri, Jun 28, 2024 at 9:11 AM

Good Morning Maria,

I have talked with my husband and prayed about the "misunderstandings" that we seem to keep having. I don't need any help
rationalizing, making decisions, or telling me what I heard. I think it is best that we end this here. I have a good relationship with
all of my tenants and I would like to keep it that way. I wish you and your family all the luck.

Sincerely,

Karen Nunez

 Gmail

Q  karen.greentree@yahoo.com   ✕  ≡  ⑦  ⚙

Compose

| | |
|---|---|
| **Inbox** | 9,740 |
| Starred | |
| Snoozed | |
| Sent | |
| **Drafts** | 38 |
| More | |

Labels

Maria Johnson 941-780-...

1 of 5

Karen Nunez

**MARIA GREEN** <greenmaria...   Fri, Jun 28, 11:00 AM (13 days ago)
to Karen

Good morning Mrs. Karen,

I did not mean that in any type of way at all. This has definitely caused a great hardship for my family.

I am totally confused as to how this even came about-- I apologize that the unit did not pass inspection on the first go...

I apologize that the Zillow app did not reflect the up-to-date information....as I have had that account for over two years.

My family and I are set to be out of the place I am by Sunday.
I have shut off the electricity there as-well-as packed up our belongings that's currently sitting in a Uhaul.

I do not even understand how this got to this point.



I do not even understand how this got to this point.

**Karen Nunez**                    Fri, Jun 28, 11:28 AM (13 days ago)
to me

I am sorry for the inconvenience, it is one for me also as I will not have the house rented July 1, resulting in a loss of 1800.00 and must go through re-posting etc. I do believe it is what is best in the long run.

I understand.    No problem, I understand.    I agree with you.

Reply    Forward

# EXHIBIT J



FOR OFFICE USE ONLY:

COMPLAINT #:

## COMPLAINT OF DISCRIMINATION

**COMPLAINANT:**
Name: Maria Johnson
Address: 8851 W CR 18
City/St./Zip Code: Lake Butler, FL 32054

**VS**

**RESPONDENTS:**
Name: Karen D. Auer Revocable Trust
Address: 5658 SW 104th Terrace
City/St./Zip Code: Gainesville, FL 32608

### TYPE OF ALLEGATION:

☒HOUSING
☐EMPLOYMENT
☐PUBLIC ACCOMMODATION
☐FAIR CREDIT
☐OTHER (PROGRAMS/SERVICES)

### THE ALLEGATION OF DISCRIMINATION IS BASED UPON:

☐SEXUAL ORIENTATION
☐AGE
☐DISABILITY
☐RACE
☐RELIGION
☐GENDER IDENTITY
☐COLOR
☐NATIONAL ORIGIN
☐RETALIATION
☐GENDER
☐MARITAL STATUS
☐CITIZENSHIP STATUS (housing only)

Revised: 12/2021

☒LAWFUL SOURCE OF INCOME (housing only)
☒FAMILIAL STATUS (housing only)
☐VETERAN STATUS (housing only)
☐STATUS AS VICTIM OF DOMESTIC VIOLENCE/DATING VIOLENCE/STALKING (housing only)

**Date of most recent discriminatory action:** 6/28/2024

**The reason the Respondent gave for the alleged discriminatory action (eg: no work, downsizing, company closing, etc.)** Ms. Nunez informed me that she wasn't going to sign the Housing Assistance Payments Contract because of all of the kids that I have listed in my household.

**The reason I believe the action is discriminatory:** In March 2024, I was selected to receive a Housing Choice Voucher from the Gainesville Housing Authority ("GHA"). My family includes myself, (1) adult child, and (4) other minor children. As I was searching for an available private rental home I located a single-family dwelling unit for rent. The owner of the home is Karen Nunez. The home is located at 2649 NW 57th Place, Gainesville, FL 32653. Ms. Nunez owns 4-5 single-family dwellings in Alachua County, under a trust called the Karen D. Auer Revocable Trust. Ms. Nunez advertised the single-family home for rent using Zillow. I applied for her rental housing through Facebook and Zillow. The application that I submitted disclosed my family composition, including my minor children. Ms. Nunez and I also discussed my family composition and she directly spoke with some of my children by phone. Ms. Nunez approved my application and we both signed a rental agreement for the home on June 27, 2024. Within the rental agreement Ms. Nunez included a provision stating that only (1) adult and (3) kids could occupy the home. Ms. Nunez obtained the information regarding my family composition from my Zillow account; however, my Zillow account was created (2) years ago and since that timeframe my family composition has expanded. After signing the rental agreement on June 27, 2024, the GHA provided Ms. Nunez with a copy of the Housing Assistance Payments Contract on June 27, 2024 for her signature. The Housing Assistance Payments Contract included my updated household size of (2) adults and (4) minor children. I spoke with Ms. Nunez on June 27, 2024 and she told me that "I'm not signing that [Housing Assistance Payments Contract] with all of those kids listed in your household." On June 28, 2024, Ms. Nunez sent me an email stating that she refused to honor the signed lease, she refused to accept the Housing Choice Voucher, she refused to sign the Housing Assistance Payments Contract, and in effect, she refused to rent to my family and I. I believe that Ms. Nunez instead rented the home to a family without children or to a family that does not receive a Housing Choice voucher.

**Personal harm suffered (ex: loss wages, increased rent, emotional distress, moving expenses, or any other expenses, embarrassment, having to do business elsewhere, lease violation):** As a result of Ms. Nunez refusing to rent the home to me, I was unable to utilize the Housing Choice Voucher because I was unable to secure another home within the timeframe required by federal law. Additionally, I lost the opportunity to relocate within Alachua County (where I work). I lost out on the opportunity to access better schools for my children. This situation has caused me emotional distress and has created instability for me and my family.

**What is your desired resolution?** I want Ms. Nunez to know that what she did was wrong and that she can't treat others wrong and think that it's okay.

Revised: 12/2021

I will advise the Office of Equity and Inclusion if my address or telephone number changes and I will cooperate fully with them in the processing of my complaint in accordance with their procedures.

Note: During the investigation of a complaint, the Office of Equity and Inclusion is neither an advocate for the Complainant or the Respondent.

_____

I declare under penalty of perjury that the foregoing is true and correct.

_Maria Johnson_
(Complainant)

Date: _September 06, 2024_

**CITY OF GAINESVILLE OFFICE OF EQUITY AND INCLUSION**
**222 E. UNIVERSITY AVE., 2nd FLOOR**
**OLD LIBRARY BLDG**
**P.O. BOX 490, STATION 52**
**GAINESVILLE, FL 32627-0490**

Revised:  12/2021

# EXHIBIT K



# City of Gainesville
## Office of Equity & Inclusion



**CONFIDENTIAL and EXEMPT FS 119.0713....**

*Sent via electronic mail*

September 9, 2024

**TO:**    Maria Johnson
           8851 W CR 18
           Lake Butler, FL 32054

**FROM:**  Zeriah K. Folston *Zouzouko Doualchi*
           Equal Opportunity Director

**RE:**    **Maria Johnson v Karen D. Auer Revocable Trust**

           **COMPLAINT OF DISCRIMINATION #: EO-E-2024-14**

This is your official notice that our office received your complaint of discrimination based on lawful source of income and familial status.  The attached external complaint was filed against **Karen D. Auer Revocable Trust**.  The complaint will be investigated in accordance with Chapter 8, Code of Ordinances City of Gainesville, Florida. A response has been requested from the Respondent within ten (10) days of their receipt of the complaint.

In carrying out this investigation, all information either received, solicited, or compiled during the course of the investigation, whether in written, verbal, or other form, will be protected and remain strictly confidential to the extent allowed by Florida law. Please be advised that retaliation is prohibited against any citizen who makes a complaint of discrimination, provides evidence or testimony during an investigation, and renders a decision or provides advice or assistance.

If you and the Respondent agree to mediation, a certified mediator will attempt to assist you both in reaching a voluntary settlement. Mediation allows you and the Respondent to talk about your concerns. Mediators don't decide who is right or wrong, but they will make suggestions of ways to solve problems and disagreements.

The administrative procedure in processing your complaint is neither an obstacle nor a prerequisite to commencing a separate civil action on your own. You have a right to commence a civil action in court not later than two years after the occurrence or termination of the alleged discriminatory housing practice. The computation of this two-year period excludes any time during which the matter is pending for administrative relief with respect to a complaint or charge based on an alleged

PO Box 490, Station 52 • 222 East University Avenue Gainesville, Florida  32602
352-334-5051  •  www.cityofgainesville.org/OfficeofEqualOpportunity

**1** | P a g e

2 | P a g e

discriminatory housing practice. However, the time period includes the time during which an action arising from a breach of a conciliation agreement is pending.

Should you have any questions concerning this matter, please contact me (352) 334-5051.

Enclosure: Complaint of Discrimination & Mediation Inquiry Form

PO Box 490, Station 52 • 222 East University Avenue Gainesville, Florida 32602
352-334-5051 • www.cityofgainesville.org/OfficeofEqualOpportunity
2 | P a g e

# EXHIBIT L

Response to Discrimination: Maria Johnson v. Karen D. Auer Revocable Trust, Karen Nunez

1. Position Statement

On June 15th, 2024 I had an open house at a rental home I own located at 2649 NW 57th Place, Gainesville, FL. I listed it on Facebook Marketplace and Zillow. I do this to alleviate driving to the home multiple times to meet potential renters who may or may not show up. I had applications available onsite but Zillow also makes applications available online. Ms. Johnson came and stayed for quite a while explaining her situation to myself and my husband. My husband began working in the first bedroom some of the time but was close enough to hear. Ms. Johnson's story touched me. She talked about her time in prison, her ex-husband, her living situation, etc. She talked about her kids and that her 2 boys would be able to cut the grass and keep up the yard, and that she had adopted her youngest from someone in her family. I decided I wanted to be her landlord and give her a chance, as I know if you have a record and not so great credit, finding a home to rent would be difficult. When I texted her one evening to give me a call about moving in the home, she was so excited she went in her sons' room, told them, and briefly put them on the phone. I have never rented to anyone with a voucher but Ms. Johnson said she knew the procedure like the "back of her hand", so that put me at ease. First, I had to have the home inspection. The inspector found a few things, so the next weekend my husband and I worked there and got everything on the list up to par. I passed the second inspection.

I e-mailed a copy of the lease to Ms. Johnson on June 25th, just so she could look it over and let me know if she had any questions. The lease stated 1 adult and 3 children. This is what I believed after speaking with her and from her application. It also stated that she would pay the security deposit of $1000.00. Ms. Johnson did not correct me on anything or ask any questions. I met her on June 25th to find out that she did not have the security deposit and somehow talked me into letting her pay it by the end of July.  Ms. Johnson could have told me this before I met her and she had many days to do so in addition to the fact that I had sent her a copy to look over, but she waited until I made the lease and drove to the home. I changed the lease to add this information as the 1st lease stated that I acknowledged receipt of $1000.00 security. I sent it to Ms. Johnson on the 26th. We agreed that she could start putting things in the home after all the paperwork was done, the electricity was in her name and the rent was paid, as there were only a few days left in June and that would make it easier for her.  I also texted her on the 26th and asked her to show me in the paperwork where the payment information was laid out. Ms. Johnson did not show it to me but rather told me I can't collect last month's rent as I do for all my rentals, and I won't receive any rent until she is completely moved in. Every step of the way Ms. Johnson would tell me another piece of information that was not revealed to me before even though I made all my requirements very clear, and they were also posted in the ad. Now someone is moving into my house with not one penny being paid by anyone. I trusted Ms. Johnson to honestly lead me through accepting vouchers. She could have told me all of this information in the beginning, after all she does work there and assured me she "knew all the steps like the back of her hand", but she neglected to do so. She also

neglected to be upfront about having the money for her part. I would have never agreed to the delayed security deposit if I had known I also wasn't getting any rent until after she was moved in. In addition, not only was Ms. Johnson's Zillow application incorrect, she read both of the leases and still said nothing about the number of occupants listed.

Late afternoon on the 27th I received paperwork from Ms. Sara Croissy stating there would be 2 adults and 4 children living in the home. I immediately called Ms. Croissy to verify this was correct. I briefly explained to Ms. Croissy the chain of events described above. She was very kind and recommended I think about it overnight and call her the next morning. Since Ms. Croissy recommended this, I thought this was acceptable since she is an employee. I told Ms. Johnson that I was not comfortable with this whole transaction based on the fact that Ms. Johnson could have told me from the very beginning how the funding was dispersed, and the fact that she did not have the security deposit. Not checking her application or lease for the correct number of occupants just added to the list of red flags for me. I did not tell her I was not signing because of all her kids. That is simply not true, and when I asked my husband how many occupants would be in the home his response was, she has 3 children.

I told Ms. Johnson I needed to think it over, that this was not starting off on the right foot. Ms.  Johnson also had her car full of items to drop at the house but the paperwork was not completed, the electric was not in her name and the rent was not paid. She had ignored every request I made. Ms. Johnson then started bombarding me with not so nice texts and threats of what she was going to do because I had signed the lease. Ms. Johnson seemed to have forgotten that her application was not accurate and she also signed a lease with incorrect information, and didn't really have the money she was supposed to pay. She even told me she could help me "rationalize" her actions and that she was sorry for the "misunderstanding".

Ms. Johnson e-mailed me a demand letter on July 15th, and then continued to text me. I never received this letter through certified mail but rather an e-mail. I lost 1800.00 through Ms. Johnson's failure to be honest as the house sat vacant for an extra month until the new tenants moved in.

For the most part I have a good relationship with all my tenants and I have long term tenants because we respect each other and are honest with each other. It is a loss for Ms. Johnson and also for myself as I was looking forward to helping Ms. Johnson accomplish that dream of living in town for her children. It is more than a financial loss as it also took an emotional toll on me to finally have to say enough is enough.

2. Final Disposition of application: Denied

3. No.

4. I received three applications (attached), all through Zillow before or the day of the open house. The first was Le Norris Lamar La Moute, received on 6/12/24 who had an eviction and income source was earned income. The second was Tanisha Donyel Webb, received on 6/14/24, source of income was earned income and Maria Green (Johnson) received 6-15-24 and voucher/earned income. Lastly are the current tenants who replied when I re-posted, Carter Bauer and Rachael Nelson, received July 4, 2024 and earned income.

5. There are two lease agreements since September of 2023. The first to Justin and Elizabeth Curtis. Justin had already been living in the home but just graduated from UF and got a job out of state which he was supposed to start in August. (hence the short lease). He left at the end of May, but paid for June so I would have time to find a tenant for July 1, 2024 (which should have been the end of his lease).The second tenants, Carter Bauer and Rachael Nelson moved in August 1, 2024.

6. Bedroom 1 – 10'x10'
   Bedroom 2 – 12'x11'
   Master        15 x 10

7. Carter Bauer and Rachael Nelson, boyfriend/girlfriend, earned income.

8. Fair Housing Policy

Not to discriminate on the basis of race, color, religion, sex, disability, family status, nationality, ancestry, gender identity or expression or sexual orientation. Not to discriminate because of source of lawful income to pay rent.

# EXHIBIT M

Rebuttal Statement:


Mrs. K. Nunez stated:


" Ms.Johnson came and stayed for quite a while explaining her situation to myself and my husband. My husband began working in the first bedroom some of the time but was close enough to hear. Ms. Johnson's story touched me. She talked about her time in prison, her ex-husband, her living situation, etc. She talked about her kids and that her 2 boys would be able to cut the grass and keep up the yard, and that she had adopted her youngest from someone in her family."


My Response: On June 15th, 2024 Mrs. Nunez had an open house for the property located at 2649 NW 57TH Place, Gainesville, Fl.  I arrived at the property early morning greeting Mr. George Nunez as he was walking out. Mrs. Nunez and I introduced ourselves—She and I began to converse about the property… I stopped Mrs. Nunez before we got too far in the process… my words her was to the exact .." Mrs. Nunez…time is one of the greatest commodities that we cannot get back…these past few weeks I have been searching for a home, but have been getting denied…The reason why is because I have a criminal record…and my credit score is not good". Mrs. Nunez then looked on Zillow and said to me… " The background check on Zillow does not reflect a criminal history. Did you pay to complete this application? " I said, " Yes, but I have had the account for a while, so I can submit a certain amount of applications for only $35.00" She then said, " Zillow does not record accurate information…that is why I do not like posting."

I agreed and told her that is why I am telling her upfront what is on my background…so that we do not waste each other's time. I explained to her that I served four years in The Department of Corrections, and I have been released for 5 years. I also shared with her that I was in the process of re-building my credit after a recent divorce of my husband of 18 years…this led to the family dynamic conversation.


After seeing that Mrs. Nunez would be willing to work with my background/ credit history…we started to discuss the household. I informed Mrs. Nunez that I have three biological kids… I said... I have two seniors and a junior. She asked me boys or girls? I told her that I have two boys and 1 girl— I then told her that I also have custody of my ex-husband's sister son…I told her he just turned 3 years old…and, thinks he run the house…. I proceeded to ask her if she accepted section 8 vouchers… Mrs. Nunez response to that question was verbatim to this "You know, my husband owns a car dealership…and the people that he serve would always ask me if I would accept vouchers, but Maria…the reason I always said no…is because of how dirty their cars looked when they brought them in."

I then assured her…that my family and I were cleaned. I then began to share with Mrs. Nunez why I have a voucher—I told her that my biological sister kid…that she gave up for adoption was homeless in Perry, Fl. I shared with her that he reached out to me for help via Facebook, and at the time the Housing Authority that I work for which is Gainesville Housing Authority awarded me a "Homeless Youth" voucher so I can find bigger housing to be able to get my nephew.  After sharing that with Mrs. Nunez... She asked me if I could explain to her how it would work.

I told her if she agreed to rent to me… She would need to complete a Request for Tenancy Approval packet so the house can get inspected. She asked me if I thought just from looking at her home…if it would pass inspection… I told her absolutely.

She then told me to let her think about it…and she will be in touch.

I thanked her for her time, and left.

K. Nunez stated:

" I decided I wanted to be her landlord and give her a chance, as I

know if you have a record and not so great credit, finding a home to rent would be difficult.

When I texted her one evening to give me a call about moving in the home, she was so

excited she went in her sons' room, told them, and briefly put them on the phone. I have

never rented to anyone with a voucher but Ms. Johnson said she knew the procedure like

the "back of her hand", so that put me at ease. First, I had to have the home inspection.

The inspector found a few things, so the next weekend my husband and I worked there and

got everything on the list up to par. I passed the second inspection."

My Response: This is true.

K. Nunez stated:

" I e-mailed a copy of the lease to Ms. Johnson on June 25th, just so she could look it over

and let me know if she had any questions. The lease stated 1 adult and 3 children. This is

what I believed after speaking with her and from her application. It also stated that she

would pay the security deposit of $1000.00. Ms. Johnson did not correct me on anything or

ask any questions. I met her on June 25th to find out that she did not have the security."

My Response:  Mrs. Nunez did in fact send me a lease to "Look over" on June 25th, 2024. Her exact words to me was. "Maria, I have never done this before and I use a standard lease for all of my tenants…Would you mind looking over this lease to see if I need to add anything so that it fits the program?"  I agreed—I looked over the lease, and said to Mrs. Nunez... "No ma'am,  that would be fine, because you will have to sign a HAP agreement and a Tenancy Addendum for the Housing Authority, and that overrides the lease, so you may use your standard lease.

Mrs. K. Nunez stated:

" The lease stated 1 adult and 3 children. This is what I believed after speaking with her and from her application. It also stated that she would pay the security deposit of $1000.00. Ms. Johnson did not correct me on anything or ask any questions. I met her on June 25th to find out that she did not have the security deposit and somehow talked me into letting her pay it by the end of July.

 Ms. Johnson could have told me this before I met her and she had many days to do so in addition to the fact that I had sent her a copy to look over, but she waited until I made the lease and drove to the home.

My Response: As I scanned over the lease--- I automatically knew that this was not my lease—I was solely viewing the lease to see if she needed to add anything to mirror the HCVP Program. One reason I knew it was not mine…is because the lease term dated was dated for a period of six months starting February 1, 2024…ending July 31, 2024 ( Please see copy of initial lease attached) . As I further scanned the lease it stated that a security deposit was paid…and, that there were ONLY 1 adult and 3 kids…in which, I knew did not meet my household composition. I solely did what she asked…scanned to see if she needed to add anything. I called her to let her know the lease would be fine…again I reiterated to her that our HAP contract would have a list of my Household Composition as-well-as my portion of rent...so, her standard lease was fine.

Mrs. K. Nunez stated:

" I met her on June 25th to find out that she did not have the security deposit and somehow talked me into letting her pay it by the end of July. Ms. Johnson could have told me this before I met her and she had many days to do so in addition to the fact that I had sent her a copy to look over, but she waited until I made the lease and drove to the home. I changed the lease to add this information as the 1st lease stated that I acknowledged receipt of $1000.00 security. "

My Response: Mrs. Nunez exact words to me was "Maria, I thought about it…and I know you are due to be out of your current place on July 1, 2024—so, if you'd like once the paperwork is complete you can go ahead and start moving in. I said... "Oh, thank you Mrs. Karen…however, I will not have the deposit until July 1, 2024... My current Landlord will give me back my Security depos---" She stopped me mid-sentence and said... "Let's just stretch it to July 31." I said…EXACT words. "Yes ma'am, but it will certainly be before then.

K. Nunez stated:

" We agreed that she could start putting things in the home after all the paperwork was done, the electricity was in her name and the rent was paid, as there were only a few days left in June and that would make it easier for her. "

My response: This is true.

K. Nunez stated:

" I also texted her on the 26th and asked her to show me in the paperwork where the payment information was laid out. Ms. Johnson did not show it to me but rather told me I can't collect last month's rent as I do for all my rentals, and I won't receive any rent until she is completely moved in.

My Response: I told Mrs. Nunez that I had no way of knowing what my portion of rent would be until GHA has completely moved me in the system. I also informed her that at that point…she would have to sign the HAP contract for GHA to release payment… I also informed her that at that point, I would know what my portion of rent would be.  I explained to Mrs. Nunez…that a landlord could not charge a last month rent for voucher holders, because the Housing Authority pays portion of the tenant rent… I gave her an example of…. If a tenant loses or gain employment by the time his/ her lease end…the last month rent could be more or less. I informed her…she could charge an additional security deposit if she chose to. Mrs. Nunez then…said to me…that she needed to think about this because at this point…her exact words ' " I am the only one with skin in the game.".

Mrs. K. Nunez stated:

"  Every step of the way Ms. Johnson would tell me another piece of information that was not revealed to me before even though I made all my requirements very clear, and they were also posted in the ad. Now someone is moving into my house with not one penny being paid by anyone. I trusted Ms. Johnson to honestly lead me through accepting vouchers. She could have told me all of this information in the beginning, after all she does work there and assured me she "knew all the steps like the back of her hand", but she neglected to do so. She also neglected to be upfront about having the money for her part. I would have never agreed to the delayed security deposit if I had known I also wasn't getting any rent until after she was moved in. In addition, not only was Ms. Johnson's Zillow application incorrect, she read both of the leases and still said nothing about the number of occupants listed.

My Response: Every single thing that Mrs. Nunez is saying…transpired before June 27, 2024 which is when we signed the lease agreement. If Mrs. Nunez felt as if those were red flags…why did she continue to sign the lease—she had more than enough time to turn back… The "Red Flags" she is allegation all transpired prior to the signing of the lease" … I was completely up front with Mrs. Nunez…all the way to the point of telling her she could charge an extra security deposit in place of her last month rent. I am a very up front and honest person. Mrs. Nunez stated money would not be paid up front... I explained to her that in this program I can not pay up front. In which, she mentioned in her position statement.

K. Nunez Stated: " not only was Ms. Johnson's Zillow application incorrect, she read both of the leases and still said nothing about the number of occupants listed."

My Response: I had already addressed with Mrs. Nunez that the HAP contract would serve as the final lease.

K. Nunez Stated: " Late afternoon on the 27th I received paperwork from Ms. Sara Croissy stating there would be 2 adults and 4 children living in the home. I immediately called Ms. Croissy to verify this was correct. I briefly explained to Ms. Croissy the chain of events described above. She was very kind and recommended I think about it overnight and call her the next morning. Since Ms. Croissy recommended this, I thought this was acceptable since she is an employee. I told Ms. Johnson that I was not comfortable with this whole transaction based on the fact that Ms. Johnson could have told me from the very beginning how the funding was dispersed, and the fact that she did not have the security deposit. Not checking her application or lease for the correct number of occupants just added to the list of red flags for me. I did not tell her I was not signing because of all her kids. That is simply not true, and when I asked my husband how many occupants would be in the home his response was, she has 3 children.

My Response: I explained to Mrs. Nunez every, single detail…step by step… As you can see in the documents I provided… Payment in the amount of $898.00 was scheduled to directly deposited in Mrs. Nunez account on July 01, 2024. I had my $902.00 to pay to her on July 01, 2024. After Mrs. Nunez received the HAP contract…she sent me an email to "Call her". I called Mrs. Nunez and she asked me "Maria, why are all of those people listed in the household? "I said, "Ma'am…what do you mean" I said…it is myself and my kids. She said... "Why does it say 2 adults, and 3 Kids?" I said, my 18 senior is considered an adult—and I have my Biological son and daughter…as-well-as Jakevin whom I adopted…and my nephew the one I told you is the reason that I have the voucher. She then stated to me " That is not what your Zillow app say." I said Mrs. Karen that is not updated. She got quiet, and said…I have to think about this.

Mrs. K. Nunez stated: " I did not tell her I was not signing because of all her kids. That is simply not true, and when I asked my husband how many occupants would be in the home his response was, she has 3 children.

My Response: When Mrs. Karen made her decision…her EXACT words to me was " I am not signing that thing with all of those kids listed on there." After Mrs. Karen said that… I was totally confused, and did not understand what she meant by that…especially seeing how I know I told her up front about my household composition. It would have made no sense to tell her the truth about going to Prison…and having bad credit…in which she could deny me for…but, still lie about the amount of kids that I had…knowing that she could not deny me for having kids, plus she would have to sign the HAP contract which would list everyone in my household.

Mrs. K. Nunez stated: " Ms. Johnson also had her car full of items to drop at the house but the paperwork was not completed, the electric was not in her name and the rent was not paid. She had ignored every request I made.

My Response: Mrs. Karen told me that I could…I had the key to the house…On that Friday…had she signed the HAP contract--- the paperwork would have been completely complete—she and I agreed that after work…I could put the belongings in the home.

Mrs. K. Nunez stated: " Ms. Johnson then started bombarding me with not so nice texts and threats of what she was going to do because I had signed the lease. Ms. Johnson seemed to have forgotten that her application was not accurate and she also signed a lease with incorrect information, and didn't really have the money she was supposed to pay. She even told me she could help me "rationalize" her actions and that she was sorry for the "misunderstanding".

My Response: I have always been nothing but kind to Mrs. Nunez throughout this entire ordeal. Please ask her to provide proofs of me threatening, or being rude to her.

Mrs. K. Nunez stated: I lost 1800.00 through Ms. Johnson's failure to be honest as the house sat vacant for an extra month until the new tenants moved in.

My Response: Ha Mrs. Nunez honored her signed agreement… GHA payment was already scheduled…you have the documents, and I would have paid my portion on July 01, 2014. It is her fault her house was not rented.

Mrs. K. Nunez stated:  " For the most part I have a good relationship with all my tenants and I have long term tenants because we respect each other and are honest with each other. It is a loss for Ms. Johnson and also for myself as I was looking forward to helping Ms. Johnson accomplish that dream of living in

town for her children. It is more than a financial loss as it also took an emotional toll on me to finally have to say enough is enough.

My Response: Mrs. Nunez took that dream away…when she decided that I had " Too many kids" …. As-far-as emotional loss… Could you imagine having your entire house packed up with five kids…and, your current landlord expecting you out by July 01…and two days before…a landlord pull out of the lease? I have been homeless before…and the fact that my current Landlord was out of town…and did not return until Sunday night…as I looked at an entire house packed up.. I had no clue where I would take my kids to if my Landlord had already promised my currently home to someone else…and, to add insult to injury—I was not able to help my homeless nephew… That is the emotional stress for any parent.

This will conclude my rebuttal…Thank you all for your time.

RENTAL AGREEMENT

Landlord: Karen Nunez, 5658 SW 104th Terrace Gainesville, FL 32608

Tenant: Maria Green

Property Address: 2649 NW 57th Place Gainesville, FL 32653

1. TERM. This Rental Agreement shall be for six months beginning February 1, 2024 and ending July 31,2024. Upon default or if Landlord resorts to court process to enforce lease the remaining rent due for the balance of the lease shall become immediately due and payable.

2. RENT. The rent shall be $1800.00 per month and shall be mailed to the landlord's address above or direct deposited. Payments must be postmarked on or before the 5th day of each month. Payments postmarked on the sixth are considered late, and a late charge of $50 shall be due; payments postmarked after the sixth accrue and additional late fee of $5.00 per day for each postmarked date after the sixth. Tenant agrees to pay a $50 fee in the event a check bounces, late fees will be due until check is made good; Landlord may then require certified funds for the remainder of the lease. All payments received shall first be applied to any outstanding charges (such as late charges) incurred by Tenant prior to applying the same to current monthly rent.

3. DEFAULT. In the event Tenant defaults under any terms of the agreement, Landlord may recover possession as provided by Law and seek monetary damages.

4. SECURITY. Landlord acknowledges receipt of $1000.00 security deposit.

5. UTILITIES. Tenant agrees to pay all utility charges on the property.

6. MAINTENANCE. Tenant has examined the property, acknowledges it to be in good repair. Tenant agrees to keep the premises in good repair and to do all minor maintenance promptly and provide extermination service. If maintenance is required Landlord shall be notified immediately. Tenant is not to allow any person on premises to evaluate or repair any part of the premises without Landlord consent.

7. LOCKS. Locks cannot be changed without contacting Landlord first.

8. ASSIGNMENT. This agreement may not be assigned by Tenant without the written consent of the Landlord.

9. USE. Tenant shall not use the premises for any illegal purpose or any purpose which will increase the rate of insurance and shall not cause a nuisance for Landlord or neighbors.

10. LAWN. Tenant agrees to maintain the lawn and shrubbery on the premises at his own expense.

11. LIABILITY. Tenant shall be responsible for insurance on his own property and agrees not to hold Landlord liable for any damages to Tenant's property on the premises.

12. ACCESS. Landlord reserves the right to enter the premises for the purposes of inspection, repairs, and to show prospective tenants or purchasers.

13. PETS. No pets allowed on premises.

14. OCCUPANCY. The premises shall not be occupied by more than 1 adult and 3 children. Any adult residing at the residence for more than 21 days must be approved and added to the lease.

15. TENANTS APPLIANCES. Tenant agrees not to use any alternative methods of heating. Also, no fixtures or appliances drawing excessive current without consent of Landlord.

16. PARKING. Tenant agrees that no parking is allowed on the premises except in driveway and garage.

17. FURNISHING. All the following items are to be returned in good condition at the termination of the agreement, Refrigerator, range, dishwasher.

18. ALTERATIONS AND IMPROVEMENTS. Tenant shall make no alterations to the property without the written consent of the Landlord and any such alterations or improvements shall become the property of the Landlord.

19. ENTIRE AGREEMENT. This rental agreement constitutes the entire agreement between the parties and may not be modified except in writing signed by both parties.

20. ATTORNEYS FEES. In the event it becomes necessary to enforce this agreement between the parties, tenant shall be required to pay Landlord's attorney fees.

21. SEVERABILITY. In the event any section of this agreement shall be held to be invalid all remaining provisions shall remain in force.

22. WAIVER. Any failure by Landlord to exercise any rights under this agreement shall not constitute a waiver of Landlord's rights.

23. SUBORDINATION. Tenants interest in the premises shall be subordinate to any encumbrances now or hereafter placed on the premises, to any advances made under such encumbrances and to any extensions or renewals thereof. Tenant agrees to sign any documents indicating such subordination which may be required by lenders.

24. SURRENDER OF PREMISES. At the expiration of the term of this lease, Tenant shall immediately surrender the premises in as good condition as at the start of this lease.

25. LIENS. The estate of the Landlord shall not be subject to any liens for improvements contracted by Tenant.

26. RADON GAS. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

27. LEAD BASE PAINT. Housing built before 1978 may contain lead-based paint. Tenant has been provided with the pamphlet "Protect your Family".

28. PEST CONTROL. Landlord does not provide pest control. The following parties have reviewed the information and agree to the terms of this rental agreement.


_____ Lessor


_____Lessee

# EXHIBIT N



# CITY OF GAINESVILLE
## Office of Equity and Inclusion

---

## INVESTIGATIVE REPORT

**DATE:**                    December 4, 2024

**TO:**                      Human Rights Board

**FROM:**                    Adam Maxwell, Compliance Investigator, OEI

**SUBJECT:**                 Maria Johnson v. Karen D. Auer Revocable Trust, Karen Nunez

**CHARGE #:**                EO-E-2024-14

---

### A. ALLEGATION/ BASIS:              Lawful Source of Income & Familial Status

#### RECOMMENDATION:

Lawful Source of Income              No Cause
Familial Status                      Cause

### B. JURISDICTION DATES:

Alleged Violation: 6/28/2024
Filing Date: 9/6/2024

### C. RESPONDENT'S TYPE OF OPERATION:

Residential Landlord

### DECLARATION OF JURISDICTION

The objective of Chapter 8 of the Code of Ordinances of Gainesville, Florida is to discourage and eliminate discriminatory practices.

In this case, the specific allegations center on the Code of Ordinances of Gainesville, Florida, 8-88(a)(4). Section 8-88(a)(4) states that it shall be unlawful "[t]o discriminate against any person

PO Box 490, Station 52 • 222 East University Avenue Gainesville, Florida 32602
352-334-5051 • www.cityofgainesville.org/OfficeofEqualOpportunity

in the terms, conditions or privileges of the sale, purchase, rental, assignment or other transfer of any housing facility, or in the furnishing of facilities or services in connection therewith, because of a protected status or characteristic." Section 8-87(14) defines familial status as one or more individuals who have not attained the age of 18 years and are domiciled with: A parent or another person having legal custody of such individual(s); or the designee of such parent or other person having such custody, with the written permission of such parent or other person.

## INVESTIGATIVE SUMMARY

Statement of Claim(s) and Issues to be investigated: Complainant alleged that she was discriminated against by the Respondent based on her lawful source of income and familial status when the Respondent refused to sign the Complainant's Housing Assistance Payments ("HAP") Contract.

## Complainant's Allegations

In March of 2024, the Complainant, Maria Johnson, was selected to receive a Housing Choice Voucher from the Gainesville Housing Authority. This voucher would assist her in securing a rental home for herself, her one adult child, and her four minor children. The Complainant identified a single-family dwelling unit, located at 2649 NW 57th Place, Gainesville, FL 32653. This home is owned by the Respondent, Karen Nunez, under the trust, Karen D. Auer Revocable Trust. The property was advertised by the Respondent via Zillow. Subsequently, the Complainant applied for the Respondent's rental housing unit via both Facebook and Zillow.

According to the Complainant, the submitted application included and disclosed information regarding the composition of her family, including her minor children. The Respondent also had an opportunity to speak with some of the Complainant's children by phone.

On June 27, 2024, both the Complainant and the Respondent signed a rental agreement for the home at the aforementioned address. Within the rental agreement, the Respondent included an occupancy provision indicating that only (1) adult and (3) children could occupy the home. The Complainant's family household number within the occupancy provision was taken from the Complainant's Zillow account. According to the Complainant, her Zillow account had not been updated in two years.

Upon signing the rental agreement on June 27, 2024, the Gainesville Housing Authority ("GHA") provided the Respondent with a copy of the HAP contract on June 27, 2024 for her signature. The HAP contract included the Complainant's current household composition of (2) adults and (4)

2

minor children. The Complainant indicated that after speaking with the Respondent about the Complainant's current household composition, the Respondent informed the Complainant, "I'm not signing that [HAP contract] with all of those kids listed in your household." Subsequently, the Respondent emailed the Complainant and informed her that she refused to sign the HAP contract; and in effect, she refused to rent to the Complainant and her family.

The Complainant believes that the home was later rented to a family without children, or to a family that is not a beneficiary of a Housing Choice voucher.

### Respondent's Position

On June 15, 2024, the Respondent hosted an open house at a rental home located at 2649 NW 57th Place, Gainesville, Florida. The total square footage of the home was 1,864 square feet. The dimensions of each bedroom were (10 X 10), (12 X 11), (15 X 10) feet respectively. The Complainant attended the open house and explained her situation to the Respondent and the Respondent's husband. While the Respondent's husband began working in another bedroom, he remained within ear's distance of the conversation between the Respondent and the Complainant. The Complainant began telling the Respondent about her time in prison, her ex-husband, and her current living situation.

The Complainant told the Respondent about her kids and how her two boys would be able to cut the grass and keep up the yard. The Complainant also mentioned that she had adopted her youngest child from another relative. Ultimately, the Complainant's story touched the Respondent. The Respondent informed the Complainant that she wanted to give her a chance and become her landlord. After the Respondent's decision to become the Complainant's landlord, the Respondent spoke with the Complainant and her sons' on the phone, and they expressed their excitement. The Respondent stated that she had never rented to anyone with a Section 8 housing voucher before, but she was put at ease by the Complainant. The Complainant informed the Respondent that she knew the specifics of the process like the "back of her hand."

On June 25, 2024, the Respondent emailed a copy of the lease agreement to the Complainant, so the Complainant could ask the Respondent any questions that she had about the lease. The lease included an occupancy provision which stated that "the premises shall not be occupied by more than (1) adult and (3) children." The Respondent included the (1) adult and (3) children occupancy provision based on her conversation with the Complainant and based on the number of household members that the Complainant included in her Zillow application. The lease also included a requirement of a $1,000 security deposit. According to the Respondent, the Complainant did not correct the Respondent on any of the lease agreement provisions.

3

The Respondent subsequently met the Complainant on June 25, 2024 to collect the security deposit. The Complainant informed the Respondent that she did not have the $1,000 security deposit to provide to the Respondent. According to the Respondent, the Complainant somehow talked the Respondent into extending the payment due date for the security deposit until the end of July of 2024. The Respondent indicated that she later amended the lease agreement to reflect the updated security deposit due date.

The amended lease agreement was then routed to the Complainant on June 26, 2024 for her signature. On June 26, 2024, both the Complainant and the Respondent agreed that the Complainant would be able to move into the home once all of the paperwork was completed, once the electricity was put in the Complainant's name, and once the Complainant paid the first month's rent. The Respondent alleged that throughout the entire Section 8 housing voucher process the Complainant, who works for the GHA, would reveal another piece of information that had not been previously revealed to the Respondent. The Respondent allowed the Complainant to move into the Respondent's home without requiring the Complainant to pay the first month's rent upfront and without collecting the security deposit. The Respondent indicated that she would have never agreed to receive a delayed security deposit if she would have known that she would also not receive any rent until after the Complainant was already moved in.

On July 27, 2024, the Respondent received the HAP contract paperwork from Ms. Sara Croissy, a GHA Section (8) Housing Choice Voucher Coordinator. The HAP contract indicated that there would be (2) adults and (4) children living in the home. This updated family composition number was different from the occupancy provision that was included within the signed rental agreement. The Respondent immediately called Ms. Croissy to discuss the updated family composition number that was included within the HAP contract. Ms. Croissy informed the Respondent that she could think about whether or not she wanted to sign the HAP contract and then call her back the next morning with her decision.

According to the Respondent, she decided not to sign the HAP contract due to the fact that the Complainant did not tell the Respondent from the beginning how the housing funding would be dispersed, the Complainant did not make the Respondent aware that she did not have all of the security deposit upfront, and because the Complainant did not check her Zillow application or the lease agreement to ensure that the correct number of occupants were added to the list.

The Respondent subsequently rented the home to a co-habituating couple (a boyfriend and girlfriend couple). According to the Respondent, she loss $1,800 as a result of her home being on the market for an extra month.

4

## Complainant's Rebuttal

In the Complainant's rebuttal, the Complainant refuted some of the allegations raised in the Respondent's Position Statement. The Complainant refuted the Respondent's allegations regarding the Complainant's household size and the Respondent's allegations pertaining to the signed rental agreement.

With regard to the issues surrounding the Complainant's household size, the Complainant indicated that she did inform the Respondent of her three biological kids (two seniors and a junior). Additionally, the Complainant stated that she made the Respondent aware that she had obtained custody of her ex-husband's sister's son who had just turned three years old. The Complainant also alleged that during her initial conversation with the Respondent on June 15, 2024, the Complainant informed the Respondent that she had been awarded a 'homeless youth' voucher to find housing large enough to support her nephew who she was intending to adopt.

After the Complainant informed the Respondent about her family composition, she asked the Respondent if the Respondent accepted Section 8 vouchers. According to the Complainant, the Respondent replied "you know, my husband owns a car dealership...and the people that he serve would always ask me if I would accept vouchers, but Maria...the reason I always said no...is because of how dirty their cars looked when they brought them in." In response to the Respondent's comment, the Complainant informed the Respondent of the cleanliness of her family.

The Complainant also refuted the Respondent's allegation that the Complainant failed to inform the Respondent about any deficiencies within the lease agreement. The Complainant alleged that on June 25, 2024, the Respondent provided her with a lease agreement so that the Complainant could "look over" it. The Respondent informed the Complainant that she had "never done this before" and that the Respondent uses a "standard lease for all of my tenants." According to the Complainant, the Respondent wanted the Complainant to look over the lease agreement "to see if I need to add anything so that it fits the program." The Complainant alleged that she informed the Respondent that the Respondent's standard lease agreement would be fine because the Respondent would have to sign a HAP agreement and a Tenancy Addendum for the GHA. The Complainant also informed the Respondent that the provisions within the HAP agreement would override the lease agreement.

5

The Complainant indicated that her sole intention for looking over the lease agreement was to see if the Respondent's leased mirrored the Housing Authority's Voucher Program. The Complainant argued that she knew that the June 25, 2024 lease agreement did not apply to her because the lease term within the June 25, 2024 agreement was dated for a period of six months, as opposed to one year and because the occupancy provision was only for (1) adult and (3) children. Finally, upon scanning the lease, the Complainant informed the Respondent that the lease would suffice as the HAP Contract would list the household composition, as well as the Complainant's portion of the rent.

## Witness Statements

The Office of Equity and Inclusion interviewed the following witnesses: Sara Croissy, GHA Section 8 Housing Choice Voucher Coordinator; Ruchelle Hobbs, GHA Director of Housing Choice Voucher Programs; and Jorge Nunez, co-owner of the rental property and husband of the Respondent.

Sara Croissy indicated that she spoke with the Respondent regarding the provisions of the HAP Contract. The Respondent informed Ms. Croissy that she was lied to by the Complainant and that the Respondent was unware of the Complainant's family composition. Ms. Croissy stated that the Respondent didn't sign the HAP contract because of the Complainant's family composition. Additionally, when asked what happens when the lease agreement conflict's with the HAP contract, Ms. Croissy indicated that the landlord would request for the GHA to amend the HAP contract or the landlord would decide to not rent the home to the applicant.

Ruchelle Hobbs indicated that she never spoke with the Respondent about the HAP contract between the Respondent and the Complainant. Ms. Hobbs, who is the Complainant's supervisor, recalled speaking with the Complainant about her interactions with the Respondent. The Complainant informed Ms. Hobbs that she had packed up all of her belongings to move into the home; however, the Respondent decided to cancel the lease agreement.

Ms. Hobbs was asked about the GHA's standard course of action for when the provisions of a lease agreement conflicts with the HAP contract. Ms. Hobbs stated that if a lease agreement is inconsistent with the HAP contract, then the HAP contract supersedes the lease agreement. Ms. Hobbs also stated that the GHA attempts to get the landlord to correct the lease agreement and then have both parties initial the changes within the lease agreement.

6

Jorge Nunez stated that he was present during the Complainant's initial visit to the home on June 15, 2024. Additionally, Mr. Nunez recalled speaking with the Complainant during her initial visit. According to Mr. Nunez, while 80% of the conversations regarding the lease agreement were discussed between the Respondent and the Complainant, he did recall hearing the Complainant discuss her children, the adoption of a child, her current living conditions, having a credit problem, being previously incarcerated, and other details about her background.

Mr. Nunez was asked about the conversation that he had with the Respondent after the Respondent was made aware that the Complainant's household size increased in the HAP contract to (6) individuals. Mr. Nunez stated that the Complainant's increase in household size from (4) to (6) was fine and that (6) people or (4) people doesn't make a difference. He indicated that he and the Respondent decided not to rent to the Complainant because the Complainant changed things throughout the process. The Complainant informed the Respondent that she wasn't going to provide the Respondent with the first nor the last month's rent, the Complainant didn't get the electricity put in her name, and the Complainant didn't have all of the money for the security deposit.

## CASE ANALYSIS, SUMMARY, AND RATIONALE

### Lawful Source of Income

For the Complainant to succeed in her claim of housing discrimination based on lawful source of income, the investigation must establish the following: (1) the Complainant is a member of a protected class; (2) the Complainant inquired about renting a dwelling; (3) the Respondent, knowing that the Complainant is a member of a protected class, refused to rent the dwelling to the Complainant; (4) the dwelling remained thereafter or Respondents expressed a willingness to negotiate the rental to someone, not of the Complainant's protected class.

The Complainant is a recipient of a Section 8 Housing Voucher, thus the first element is met. The Complainant submitted a rental application to reside at the Respondent's home via Zillow and Facebook, thus the second element is met.

The Complainant did not provide sufficient evidence to establish the third element. The Complainant made the Respondent aware of her lawful source of income status on June 15, 2024 during the Complainant's initial conversation with the Respondent. As a result of their initial conversation, the Respondent decided to give the Complainant a chance after the Respondent heard about the Complainant's personal challenges and her current living situation. Additionally, on

7

June 25, 2024, both the Respondent and the Complainant signed a lease agreement in which the Respondent was aware that she would receive some of the rental funds from the Complainant and the rest of the rental funds from the GHA. The Respondent provided GHA with a voided check so that the GHA could send the Respondent their portion of the rent via direct deposit. Furthermore, after both parties signed the lease agreement, the Respondent provided the Complainant with a key to the home.

Based on the evidence provided, there is no cause to believe that the Respondent violated the Code of Ordinances of Gainesville, Florida, Section 8-88(a)(4) based on the Complainant's Lawful Source of Income protected status.

**Familial Status**

For the Complainant to succeed in her claim of housing discrimination based on familial status, the investigation must establish the following: (1) the Complainant is a member of a protected class; (2) the Complainant inquired about renting a dwelling; (3) the Respondent, knowing that the Complainant is a member of a protected class, refused to rent the dwelling to the Complainant; (4) the dwelling remained thereafter or Respondents expressed a willingness to negotiate the rental to someone, not of the Complainant's protected class.

Code of Ordinances of Gainesville, Florida, Section 8-87(14) defines familial status as one or more individuals who have not attained the age of 18 years and are domiciled with: A parent or another person having legal custody of such individual(s); or the designee of such parent or other person having such custody, with the written permission of such parent or other person.

According to the 2024 International Property Maintenance Code, section 404.4.1 ("Bedroom & Living Room Requirements"), "Every habitable room shall contain not less than 70 square feet (6.5 m$^2$) and every bedroom occupied by more than one person shall contain not less than 50 square feet (4.6 m$^2$) of floor area for each occupant thereof."

The Complainant is a recipient of a Section 8 Housing Voucher, thus the first element is met. The Complainant submitted a rental application to reside at the Respondent's home via Zillow and Facebook, thus the second element is met.

The Respondent was made aware of the Complainant's familial status after the Complainant told the Respondent about her family composition during their initial meeting on June 15, 2024; additionally, the Respondent was made aware of the Complainant's familial status and the number of her household after the Respondent reviewed the GHA HAP contract. Even after being made aware of the Complainant's family composition at the beginning and at the end of the rental

8

process, the Respondent still refused to rent to the Complainant, thus, the third element was met. The Respondent provided evidence that after she refused to rent to the Complainant, by declining to sign the HAP contract, the Respondent subsequently rented out the home to a cohabiting couple without children, thus the fourth element was met.

Additionally, the total areas of the (3) bedrooms were 100, 132, 150 square feet respectively. Per the 2024 International Property Code, each bedroom of the home allotted for at least (2) occupants; thus a total of (6) occupants could legally occupy the home.

As all of the prima facie elements were met, the burden shifts to the Respondent to articulate a legitimate, nondiscriminatory reason for her actions. In defense of her actions, the Respondent indicated that she decided not to sign the HAP contract because the Complainant did not have the funds to pay the security deposit prior to the Complainant moving into the home. Additionally, the Respondent indicated that she decided not to sign the HAP contract because the Complainant did not provide her with the first and last month's rent prior to the Complainant moving into the home.

Because the Respondent provided nondiscriminatory reasons for her actions, the Complainant must now demonstrate that the Respondent's reasons for refusing to rent to her are a pretext for discrimination. In regards to the security deposit issue, the Complainant stated that after she made the Respondent aware that she would not have the security deposit until July 1, 2024, the Respondent indicated that the Complainant could stretch the security deposit due date until July 31, 2024. The Complainant provided evidence that on June 26, 2024, the Respondent provided her with an amended rental agreement. The amended rental agreement indicated that the "$1,000 security deposit [is] to be paid by July 31st 2024." According to the Complainant, the Respondent was aware that the Complainant would submit the security deposit late and the Respondent's actions of signing the amended rental agreement on June 27, 2024, established that she was okay with receiving the deposit on a later date.

In regards to the Respondent not receiving the first and the last month's rent, the Complainant indicated that the Respondent was aware that she would not receive the full first month rental payment until after the Respondent signed the HAP contract. The Complainant indicated that she was responsible for paying the Respondent $902.00 for her portion of the monthly rent and that the GHA would pay the remainder of the monthly rent ($898.00). The Complainant provided the Office of Equity and Inclusion with a copy of the HAP contract. The HAP contract was provided to the Respondent on June 27, 2024 for her signature. The HAP contract indicated that the GHA was scheduled to pay the Respondent $898.00, via direct deposit, on July 1, 2024.

9

The Complainant also alleged that she informed the Respondent that she could not pay the Respondent that last month's rental amount upfront because the HAP contract required the rental payments to be paid on a monthly basis. According to the Complainant, the Respondent was aware of all of the nondiscriminatory reasons that she provided prior to the Respondent signing the amended lease agreement on June 27, 2024. The Complainant argues that the Respondent's decision to not sign the HAP contract on June 27, 2024 was ultimately made upon seeing the familial occupancy provision within the HAP contract.

Therefore, based on the foregoing, there is reasonable cause to believe that the Respondent violated the Code of Ordinances of Gainesville, Florida, Section 8-88(a)(4).

**REVIEWED AND**
**APPROVED BY:**

Zeriah K. Folston, Equal Opportunity Director                    Date

2/13/25

10

# EXHIBIT O

**CITY OF GAINESVILLE FLORIDA**
**OFFICE OF EQUITY & INCLUSION**

## CITY OF GAINESVILLE HUMAN RIGHTS BOARD

Maria Johnson
Complainant

v.

DISCRIMINATION COMPLAINT
EO-E-2024-14

Karen D. Auer Revocable Trust
Respondent

### NOTICE OF DETERMINATION OF REASONABLE CAUSE

This cause came on to be heard by the City of Gainesville, Human Rights Board (hereinafter "Board") on February 24, 2025. The Board received a copy of the Equal Opportunity Director's report, which found NO REASONABLE CAUSE to believe that a discriminatory practice occurred on the basis of LAWFUL SOURCE OF INCOME. The Board received a copy of the Equal Opportunity Director's report, which found REASONABLE CAUSE to believe that a discriminatory practice occurred on the basis of FAMILIAL STATUS.

The Board had the opportunity to review the report and submit comments to the Director. Thereafter, the Board deliberated and determined that reasonable cause exists to believe that a discriminatory practice occurred on the basis of FAMILIAL STATUS, to wit: a violation of the City of Gainesville's Anti-Discrimination Ordinance, Chapter 8 – Article V – Section 8-88, Prohibition of discrimination in the sale or rental of housing. This notice of determination of reasonable cause is hereby issued.

The Equal Opportunity Director will continue conciliation efforts. The matter will be scheduled for an administrative hearing.

Pursuant to Section 8-95(n), Gainesville Code of Ordinances, a Complainant, a Respondent, or an aggrieved person on whose behalf the complaint was filed, may elect, in lieu of an administrative hearing pursuant to this article, to have the claims asserted in the charge decided in a civil action and such election must be made not later than (20) days after the date of receipt of the Notice of Determination of Reasonable Cause. The person making the election shall give notice to the board and all other parties.

Pursuant to Section 8-95(p), Gainesville Code of Ordinances, if timely election of a civil action is not made under Section 8-95(n), the charge will proceed to an administrative hearing. An evidentiary hearing on the merits shall be held. Any conciliation agreement reached prior to a scheduled hearing may result in such hearing being cancelled. The City, through the City Attorney's Office, shall arrange for the services of a hearing officer to conduct the administrative hearing.

Ordered this 24th day of February 2025.

Jonathan Stephens, Chair
City of Gainesville Human Rights Board

# EXHIBIT P



# City of Gainesville
## Office of Equity & Inclusion



*Sent via electronic mail*

March 5, 2025

**TO:**        Maria Johnson
8851 W CR 18
Lake Butler/FL/32054

**FROM:**    Zeriah Folston
Equal Opportunity Director

**RE:**        **Maria Johnson v Karen D. Auer Revocable Trust, Karen Nunez**

**COMPLAINT OF DISCRIMINATION:  EO-E-2024-14**

Dear Complainant:

After the notice of determination of reasonable cause on the basis of familial status was served, you elected to have the claims asserted in your charge decided in a civil action. As a result of this, your case has been closed with the Office of Equity and Inclusion.

If we can be of assistance in the future, please let us know.

Sincerely,

Zeriah K. Folston, Equal Opportunity Director

---

PO Box 490, Station 52 • 222 East University Avenue Gainesville, Florida 32602
352-334-5051 • www.cityofgainesville.org/OfficeofEqualOpportunity

1 | Page